**UNITED STATES of America, Appellee,**

v.

**Nancy PETERSON,
Defendant-Appellant.**

**No. 209, Docket 86–1202.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 30, 1986.

Decided Jan. 6, 1987.

E. George Nyberg, Yonkers, N.Y., for defendant-appellant.

Elliott B. Jacobson, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Bruce A. Green, Asst. U.S. Atty., New York City, on the brief), for appellee.

Before KEARSE and ALTIMARI, Circuit Judges, and STEWART, District Judge.[*]

[*] Honorable Charles E. Stewart, Jr., Senior Judge of the United States District Court for the South-

KEARSE, Circuit Judge:

Defendant Nancy Peterson appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before Charles L. Brieant, Jr., *Judge*, now *Chief Judge*, convicting her of possessing a check stolen from the United States mail, knowing it to have been stolen, in violation of 18 U.S.C. § 1708 (1982). Peterson was sentenced to six-months' imprisonment; she remains at liberty pending this appeal. She contends principally that the trial court erred in admitting so-called similar act evidence either to (a) impeach her credibility or (b) show that she knew the check at issue was stolen. Finding merit in these contentions, we vacate the judgment and remand for a new trial.

## I. BACKGROUND

To the extent pertinent to the similar act evidence, the proof at trial included the following. It was stipulated that on or about October 26, 1982, the Hartford Insurance Company mailed the $1,205.44 check that is the subject of the present indictment to Jacob Azapian (the "Azapian check"). On November 15, 1982, the Azapian check, endorsed with Azapian's name, was deposited in a joint bank account belonging to Peterson and her common-law husband Amos Whitted. Azapian never received or endorsed the check. Nor did he give Peterson permission or authority to take, use, possess, sign, or endorse the check.

Carl Raichle, a document analyst employed at the United States Postal Inspection Service Crime Laboratory, was called as an expert witness for the government and testified that he had compared the endorsement on the Azapian check with handwriting exemplars of Peterson and Whitted. Raichle gave his expert opinion that Whitted did not write the Azapian endorsement and that Peterson did.

ern District of New York, sitting by designation.

At the close of the government's direct case, Peterson moved to dismiss on the ground that the government had not proven that Peterson knew the check was stolen. The motion was denied.

The defense called three witnesses: Whitted, Peterson, and a character witness. Whitted testified that he had done some auto repairs for a woman whose name he did not know, and that she had paid him $90 by means of the Azapian check. He said the woman had telephoned her boyfriend who authorized her to sign the check; she then endorsed the check and asked Whitted to cash it, which he did, returning the proceeds, less $90, to her. Whitted testified that Peterson never saw the Azapian check. On direct examination, Whitted testified that he had previously been convicted of forgery and first-degree robbery; on cross-examination, he also admitted to several convictions for petit larceny and issuing bad checks.

Peterson testified that she had never seen the Azapian check before the postal authorities contacted her during their investigation. She testified that she did not endorse it, did not deposit it, and did not know it was stolen from the mails.

On cross-examination Peterson was asked about several other checks. As to an October 1981 check payable to one Christine Williams ("Williams check"), Peterson was asked and answered as follows:

Q: Isn't it a fact that you forged the endorsement of Christine Williams on that check, ma'am?

A: No, that is not a fact. That is a lie.

Peterson was also asked whether she had given her landlord a stolen check payable to one Tammy Turner, representing that Turner was a friend of hers; she denied that she had done so. She was asked about the appearance of her palmprint on a stolen check payable to one Michelle Newkirk; she denied having possessed that check. The government proffered no evidence relating to the Turner and Newkirk checks.

As part of its rebuttal case, the government was permitted, over objection, to introduce into evidence the Williams check, together with Raichle's testimony that the endorsement on that check was in the handwriting of Peterson. Although the government's attorney had earlier stated, during a side-bar conference in which he sought to justify a hypothetical question to the character witness based on the Williams check, that he had "information from Christine Williams that she never received" this check, no evidence was offered that Williams had not received it or had not authorized Peterson to possess or endorse it. Nor, except for the expert's testimony that the endorsement was in the handwriting of Peterson, was any evidence offered that the Williams check had ever been in the possession of Peterson. The prosecutor stated, in urging the court to admit the Williams check, "It's just that the handwriting expert is going to testify that is a match. The others the witnesses are not available."

The court ruled that the evidence as to the Williams check would be admitted as "a prior similar act bearing on knowledge and intent." It instructed the jury that the check could also be considered as impeachment of Peterson's credibility:

Members of the jury, before counsel proceeds let me give you a limiting instruction. This particular testimony you are about to hear can only be used for a very limited purpose. This particular Williams check, this defendant is not charged with any crime in connection with this Williams check. This testimony may be considered by you solely for whatever evidence or assistance it may give you in determining the defendant's knowledge and intent insofar as concerns the check with which she is charged; and secondly, for whatever bearing it may have on her credibility as a witness or whatever assistance it may give you in assessing the credibility of her testimony. She is not on trial for the Williams check.

The government's rebuttal also included a signed statement by Whitted and testimony of a United States Postal Inspector to the effect that Whitted had told the author-

ities during the investigation that he had never possessed the Azapian check or received any of its proceeds.

In his summation, as discussed in greater detail in Part II.B. below, the prosecutor attacked the veracity of both Whitted and Peterson. As to Peterson, he placed emphasis on the Williams check as being another forgery by Peterson:

> Finally, the Jacobo [*sic*] Azapian check is not the only check she forged. We know from government Exhibit 6, check for $192 to Christine Williams, that is also in evidence that you can also look at, that she forged the endorsement of Christine Williams on that check as well. She says on the stand she knows nothing about these checks, nothing about forged checks and, yet on two the endorsement is hers, forgery on each of them.

> I submit to you ladies and gentlemen ultimately her testimony too is not worthy of belief.

The district court charged the jury that it could, but was not required to, infer from the facts of proper mailing and nonreceipt by the addressee that the Azapian check was stolen from the mails. The court also charged the jury that if it first found beyond a reasonable doubt that Peterson in fact possessed the Azapian check, it could, but was not required to, infer from Peterson's unexplained possession of recently stolen property that Peterson knew it was stolen. The court instructed the jury that all credibility issues were for the jury to decide.

The jury found Peterson guilty as charged, and she was sentenced as indicated above.

## II. DISCUSSION

On this appeal, Peterson contends principally that the court erred in admitting the evidence concerning the Williams check, either for purposes of impeachment or as proof of knowledge. She also argues that the prosecutor was unfair in his summation and that the court's jury charge on knowledge was erroneous. We conclude that the Williams check should not have been admit-

ted for purposes of impeachment and that, in the circumstances, its very slight probative value as evidence of knowledge that the Azapian check was stolen was so far outweighed by its potential for undue prejudice that its admission was an abuse of discretion.

### A. *The Williams Check Evidence*

■ At the outset we reject the government's argument that Peterson did not sufficiently challenge the admission of the Williams check evidence at trial. Her counsel objected to the introduction of the Williams check and to the elicitation of Raichle's testimony regarding it, and he repeatedly sought to curtail the government's cross-examination of Peterson into the assumed other instances of dealing with other persons' checks. He also had objected to the cross-examination of the character witness called by Peterson insofar as the witness was asked about the assumed similar acts by Peterson. Though the grounds may not have been stated with each of counsel's objections, we conclude that the objections were sufficient, taken in context, to alert the trial court that Peterson objected to this "other act" evidence for any purpose. *See* Fed.R.Evid. 103(a)(1) (party should state the "specific ground of objection" unless the specific ground is "apparent from the context"). Indeed, during the cross-examination of Peterson as to these matters, after the court had previously sustained objection to the use of the other assumed incidents in the cross-examination of the character witness, Peterson's counsel sought to approach the bench but was told by the court that it was "[n]ot necessary." In all the circumstances, we conclude that Peterson's objections to the use of the Williams check evidence either for purposes of impeachment or to show knowledge were adequately preserved for appeal.

### 1. *To Attack Credibility*

■ If the Williams check had been offered by the government solely to impeach

Peterson's credibility, the court would have been required to exclude it from evidence. Fed.R.Evid. 608(b) provides, in pertinent part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking ... his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence." Thus, if the admission of the Williams check evidence is to be upheld, it must have been properly admissible to prove Peterson's knowledge that the Azapian check was stolen.

### 2. To Prove Knowledge

Preliminarily, we note our rejection of Peterson's argument on appeal that the admission of any similar act evidence was improper because her knowledge was not in issue. For a party to prevail on such an argument, "[t]he record must reflect ... unequivocal concession of the element by the defendant." *United States v. Mohel,* 604 F.2d 748, 754 (2d Cir.1979); *accord United States v. Figueroa,* 618 F.2d 934, 942 (2d Cir.1980); *United States v. Williams,* 577 F.2d 188, 191 (2d Cir.) (defendant must "affirmatively take the issue ... out of the case"), *cert. denied,* 439 U.S. 868 (1978). Here, however, Peterson's counsel moved for a judgment of acquittal at the end of the government's case on the precise ground that knowledge had not been proven. Further, his last question to Peterson on direct examination was "Do you know this check was stolen from the United States mails?" She responded, "No sir, I don't." Plainly, Peterson failed to remove the issue of knowledge from the case.

■ Fed.R.Evid. 404(b) allows the admission of evidence of "other crimes, wrongs, or acts" in order to prove, *inter alia,* that the defendant had knowledge of a pertinent fact. When the other act is unconnected with the offense charged it must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence. *See generally* 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence* § 5245 (1978). In determining whether to allow "similar act" evidence, the trial judge is required to perform a balancing analysis, and he may exclude the evidence, even if it has some relevance to prove knowledge, if its probative value is substantially outweighed by its potential for prejudice. Fed.R.Evid. 403, 404(b) Advisory Committee Note.

■ When it is clear that the trial court has performed its balancing task under Rule 403, the appellate court will not overturn its decision to admit or exclude the evidence unless the trial court has plainly abused its discretion. *See, e.g., United States v. Martino,* 759 F.2d 998, 1005 (2d Cir.1985); *United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984). We would consider it an abuse of discretion to admit such evidence if the other act were not sufficiently similar to the conduct at issue, *see United States v. Leonard,* 524 F.2d 1076, 1090–91 (2d Cir.1975) (dictum), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976); *United States v. Cook,* 557 F.2d 1149, 1152–55 (5th Cir.1977) (only evidence proffered of prior fraudulent act was defendant's consent to entry of an injunction in which defendant neither admitted nor denied fraud), *cert. denied,* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978), or if "the chain of inferences necessary to connect evidence with the ultimate fact to be proved" were unduly long, *see United States v. Lyles,* 593 F.2d 182, 195–96 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979).

■ In the context of cases such as the present one, in which the government did not offer into evidence all of the information that it represented it had with respect to the other act, it is important to note that the probative value to be weighed by the trial court in its balancing analysis is the degree to which the advocated inference is warranted from the evidence that is to be introduced. Since it is the jury that is to decide whether or not to draw such inferences, the court, in weighing the proffered evidence's probative value, must take

care to assess the strength of the evidence in the form that it is to be presented to the jury and not to assess it in the light of facts that will remain unknown to the jury. The evidence, standing alone, might, for example, only weakly support the desired inference but strongly support that inference if proof of additional facts were in evidence; if that additional information is not to be placed in evidence, however, and is made known only to the court, the court should not consider the additional information in assessing the proffered evidence's probative value.

■ This point has particular application to the present case, for the evidence presented to the jury with respect to the Williams check consisted solely of the physical exhibit and the testimony of Raichle that the Williams endorsement was in Peterson's handwriting. In and of itself, this evidence provided at best minimal support for the proposition that Peterson had knowledge that the Azapian check had been stolen. The district court may well have been influenced by the government's earlier representation that it had information from Williams that she had never received her check; but since the government stated that no witness could be called to place this information before the jury, the court could not properly consider Williams's alleged nonreceipt of the check as enhancing the probative value of the check and the expert's testimony.

■ Moreover, even if the government had actually introduced the information it represented it had received, the evidence before the jury would have only weakly supported an inference that Peterson knew the Azapian check had been stolen, for that information was only that Williams had not received her check. There was no suggestion that the government could prove any other facts sufficient to show similarity between the circumstances surrounding the Azapian check and those surrounding the Williams check. There was, for example, no offer of proof that the Williams check had been deposited into any account owned by Peterson or that

Peterson had otherwise received any of the proceeds; thus, absent the opinion testimony of the handwriting expert, there was no evidence that Peterson had ever possessed the Williams check. Further, even the expert's opinion that Peterson had written the Williams endorsement was insufficient to establish that either her possession or her endorsement was wrongful. Endorsing a check in another's name is not in itself a forgery; indeed, when such a signature is authorized it is an act specifically approved by law, *see* N.Y.U.C.C. § 3–403(1) (McKinney 1964). It is an illegal or wrongful act, and thereby an act "similar" to the § 1708 offense, only if it is done knowingly without authorization. Yet the government neither proved nor offered to prove that Peterson had not been authorized to possess or to endorse Williams's name to this check.

■ Thus the record was barren of evidence that endorsement of the Williams check represented a similar act from which the jury could reasonably infer that Peterson knew the Azapian check had been stolen. There was no evidence that the Williams check itself had been stolen, no evidence that any possession of that check by Peterson was unauthorized, and no evidence that Peterson's signing of Williams's name in the endorsement was unauthorized. Though the prosecutor asked Peterson whether she had "forged" that endorsement, the question itself was obviously not evidence, and the government was not entitled to prove forgery of the endorsement on that check merely through elicitation of a denial which it could ask the jury to disbelieve. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) ("Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.").

Since the jury could not reasonably infer knowledge that the Azapian check had been stolen merely from Peterson's endorsement of Williams's name on another check as to which the jury was given no background information whatever, the ef-

fect of the admission of the Williams check evidence was to lead the jury to speculate that the Williams check too had been stolen and that Peterson's endorsement of it was unauthorized. The prejudicial effect of allowing such speculation was amplified by representations of the prosecutor in his summation that improperly suggested that he had knowledge beyond what was in the record, *i.e.*, that

> the Jacobo [*sic*] Azapian check is not the only check she *forged*. *We know* from government Exhibit 6, check for $192 to Christine Williams, that is also in evidence that you can also look at, that she *forged* the endorsement of Christine Williams on that check as well.

(Emphasis added.) Thus, the minimal probative value of the evidence itself increased the likelihood of unfair prejudice from its admission, for a jury is quite likely to accept such a statement by the prosecutor—which, of course, went far beyond the evidence that was in the record—at face value.

■ The record does not reflect any recognition by the district court of the very limited amount of information provided by the Williams check evidence actually offered by the government, or of the consequence that in order to make any reasonable use of this evidence as a basis for inferring Peterson's knowledge that the Azapian check had been stolen, the jury would be forced to speculate as to the existence of crucial unproven facts. We are thus not persuaded that the court properly performed the balancing analysis envisioned by Rules 403 and 404(b), and we conclude that the admission of this evidence was an abuse of the court's discretion.

■ We are unable to conclude that the error in admitting the Williams check evidence was harmless since we " 'cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error....' " *United States v. Ruffin*, 575 F.2d 346, 359 (2d Cir.1978) (*quoting Kot-*

*teakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946)). The principal issues were Peterson's knowledge that the Azapian check was stolen and her credibility in denying that she had had anything to do with that check. The jury was instructed that it could use the Williams check evidence in deciding both issues, and this evidence became the focal point for the prosecutor's summation on both issues:

> She says on the stand she knows nothing about these checks, nothing about forged checks and, yet on two the endorsement is hers, forgery on each of them.
>
> I submit to you ladies and gentlemen ultimately her testimony too is not worthy of belief.

The prosecutor's dwelling on the Williams check evidence strongly suggests that its admission had more than slight effect. *See, e.g., United States v. Ruffin*, 575 F.2d at 359–60 (prosecutor's dwelling on erroneously admitted evidence suggests error was not harmless); *United States v. Pagan*, 721 F.2d 24, 31 (2d Cir.1983) (when accused's credibility was critical issue, erroneous admission of evidence to impeach accused's credibility was not harmless error). And given the addition of the prosecutor's improper statement that the government "kn[e]w" that Peterson had "forged" the Williams endorsement, we are unable to reach any conclusion other than that the erroneously admitted evidence likely had a substantial effect on the jury.

Accordingly, we vacate the judgment of conviction and remand for a new trial.

### B. *Other Asserted Errors*

Since the case is to be remanded for further proceedings, we note briefly here our rejection of the other arguments made by Peterson on this appeal, which include broader challenges to the prosecutor's summation and to the court's charge on knowledge.

During its summation, the government attacked the credibility of both Whitted and Peterson. Several times it called Whitted a

"liar," indicating that its characterization was based on (1) the conflict between Whitted's testimony and the statement he had given investigators, (2) the "inherent absurdity" of Whitted's "fabrication" as to the unknown woman's endorsement of the Azapian check, and (3) Whitted's failure to mention on direct examination a number of the crimes of which he had been convicted. The prosecutor stated "[t]his man has a rap sheet longer than this jury rail," and proceeded to list the types of convictions Whitted had admitted on direct and cross-examination. He also characterized certain of Peterson's testimony as a "lie" based on other evidence in the record. We reject Peterson's contention that the summation, except as discussed in Part II.A. above, was improper.

◼ Statements designed to appeal to the jury's emotions or to "inflame the passions or prejudices of the jury," American Bar Association Standard 3-5.8(c), are improper. *See, e.g., United States v. Marrale*, 695 F.2d 658, 667 (2d Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1434, 1435, 75 L.Ed.2d 793 (1983); *United States v. Modica*, 663 F.2d 1173, 1178-81 (2d Cir. 1981) (citing cases), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Use of the words "liar" and "lie" to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory. *See United States v. Williams*, 529 F.Supp. 1085, 1106-07 (E.D.N.Y.1981) (Pratt, J.), *aff'd*, 705 F.2d 603, 624 (2d Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

◼ Here, the prosecutor's characterization of Whitted's testimony as lies, which in each instance the prosecutor tied to the pertinent evidence of record, was plainly directed toward the credibility of the witnesses and was within the bounds of propriety. It was not accompanied by intemperate statements evincing either the purpose or the likelihood of appealing to the jury's emotions rather than to its reason. The reference to Whitted's rap sheet as "longer than the jury rail" was no more than obvious and unobjectionable hyperbole in the course of commenting on Whitted's credibility.

Nor do we find error in the court's instructions on knowledge. Peterson criticizes the charge for allowing the jury to infer Peterson's knowledge that the check was stolen merely from the fact that she possessed it, rather than stating that the jury could draw this inference of knowledge only if Peterson's possession were "unexplained," *see Barnes v. United States*, 412 U.S. 837, 845, 93 S.Ct. 2357, 2362, 37 L.Ed.2d 380 (1973). This criticism misreads the charge and ignores the record.

◼ First, the court's charge did in fact refer to "a defendant's unexplained possession." Second, the court took care to remind the jury that Peterson disputed that she had ever possessed the check, and stated that it must first determine whether the government had proven beyond a reasonable doubt that she had possessed it. Only then could the jury proceed to the question of whether to infer from her possession that she knew the check was stolen. The court then stated that possession might be satisfactorily explained so as to negative an inference of knowledge, but it pointed out that Peterson had not offered any explanation for her possession of the check, for she had categorically denied possession. This observation was accurate; the only explanation offered was that of Whitted, who claimed that he had received the check and that Peterson had no knowledge of it. Peterson never admitted that she had possessed it or offered any explanation for the presence of her handwriting on it. Hence, even if the charge had not spoken in terms of a defendant's unexplained possession, the omission would have been proper in the context of this case.

◼ Finally, for what it may be worth at a retrial, we note that at the first trial, defense counsel did not challenge the prosecutor's good faith basis for the questions posed to Peterson on cross-examination as

to the assumed other instances of her possession of checks belonging to Turner and Newkirk. In the absence of such a challenge, the appellate court has no occasion to question that there is a proper factual basis for the questions. If, however, the government is "confronted with a demand for an offer of proof" it must "provide some good faith basis for questioning that alleges adverse facts." *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984).

## CONCLUSION

The judgment of conviction is vacated and the matter is remanded for further proceedings not inconsistent with this opinion.