**UNITED STATES of America, Appellee,**

v.

**Gad GILAN, Defendant–Appellant.**

**No. 1158, Dockets 91–1089, 91–1202.**

United States Court of Appeals,
Second Circuit.

Argued April 2, 1992.

Decided June 22, 1992.

Mark B. Gombiner, New York City (The Legal Aid Soc., Federal Defender Services Appeals Unit), for defendant-appellant.

Seth L. Marvin, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Peter A. Norling, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before KEARSE and MAHONEY, Circuit Judges, and RESTANI,* Judge.

RESTANI, Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York, McLaughlin, *Circuit Judge*, sitting by designation, dated January 17, 1991 after a jury trial, convicting Gad Gilan and Offer Cohen of conspiring to steal goods moved in interstate commerce and to defraud (18 U.S.C. §§ 659, 1343 (1988)) in violation of 18 U.S.C. § 371 (1988), and stealing goods moved in interstate commerce, 18 U.S.C. § 659 (1988). Appellant Gilan argues that his conviction should be reversed because the district court improperly admitted evidence of an earlier uncharged theft pursuant to Rule

---

* Honorable Jane A. Restani, of the United States Court of International Trade, sitting by designa-tion.

404(b) of the Federal Rules of Evidence (evidence of "other crimes, wrongs, or acts" admissible to prove, *inter alia*, intent, knowledge, identity or absence of mistake) and the evidence, if relevant, was unfairly prejudicial and not admissible under Rule 403.

We find that the district court erred in admitting evidence of the uncharged act. Accordingly, this case is remanded for a new trial.

### Background

Appellant was charged, together with Offer Cohen, of theft and conspiracy to defraud and to steal from Opportunities Plus ("OP"), a company that liquidates inventory, of over $300,000. The government charged that in October 1988 appellant obtained 16,309 pairs of shoes from OP by using false names and companies, together with a fraudulent certified check. Gilan was alleged to have delivered the fraudulent check, picked up shoes on four separate occasions over a two day period, and then transferred the shoes to a warehouse. Gilan's defense was lack of knowledge and intent; he claimed he was the innocent dupe of an unindicted individual, Simone Asseraf.

### 1. The charged crime—the Ciao shoe theft.

In July 1988, Jack Kleven, President of the Footwear Division of OP, learned that a company named Lifestyle International was interested in liquidating 24,000 pairs of Ciao brand men's shoes. Kleven contacted Simone Asseraf, whom he had met through a prior uncompleted deal, to discuss the possibility of Asseraf's purchase of the shoes. Kleven and Asseraf agreed that Asseraf would buy the shoes and resell them, splitting the profit with OP. Asseraf informed Kleven that he had buyers for 17,000 pairs at $20 per pair; the buyers were identified as Azor International, a company owned by an Al Azor, and Neli Shoe Corporation, a shoe company located on Coney Island Avenue, Brooklyn. Based

on this agreement, Kleven made a successful bid for the shoes at $16 per pair.

In the late summer of 1988, two men rented space in a Garnerville, New York, warehouse. The men indicated that they wanted to lease storage space for some shoes. The manager of the warehouse, William Decker, stated that the men introduced themselves as "Offer Comen" and "Simone." Decker identified Offer Cohen as "Offer Comen." These men took out a lease in the name of Nicole Importing Company and obtained an insurance policy for the premises in the name of a company called Azor International Incorporated.[1]

On September 15, 1988, Kleven, Asseraf and Victor Ringel, an OP principal, met at M. Stoff, a Manhattan business, to discuss the sale. At this meeting, Asseraf placed a telephone call to a man he identified as Al Azor. Ringel spoke with Azor and told him that OP wanted payment by wire transfer. After further discussion, they agreed that payment would be by certified check.

Asseraf later told Kleven that Azor's portion of the shipment would be purchased by someone named Sam Rubin. Asseraf told Kleven that Rubin wished to look at the shoes. Accordingly, on October 3, 1988, Kleven met Asseraf and Rubin at the Boston Airport. The men drove to the Lifestyle warehouse and inspected the shoes. The shoes were found to be satisfactory, and it was arranged that the shoes would be shipped the following day to Azor International at 1410 69th Street, Brooklyn, and to Neli at 1601 Coney Island Avenue, Brooklyn.

On October 5, Malcolm Levy, an OP partner, received a certified check for $320,000 from a man who identified himself as a messenger for Asseraf. The check was drawn on the account of a company called A & T Juvenile Incorporated and was signed by Albert Fox. Before trial, Levy had not identified either of the defendants as the messenger. On the day before he testified, Levy observed Gilan in the court-

1. The check for the insurance premium was later returned for insufficient funds, and the address of the company was found to be the address of an unconnected insurance company.

house. Levy testified that when he saw Gilan, he recognized him as the messenger.

On October 6, 1988, Levy deposited the check at the bank. He asked the bank to wire funds to Lifestyle so that the shoes could be released to Neli and Azor International Incorporated.

Immediately after OP received the check, the purchasers made attempts to get the shoes. At this time the shoes were being held by PIE, a trucking company. Mark Ross, a supervisor at the New York PIE facility, stated that on October 7, he received several calls from a man who stated that he was a representative of Azor and wanted to know when the shoes could be delivered. Ross was told that Azor was "hot" to have the shoes and that they should be delivered to 1601 Coney Island Avenue, rather than to the 69th Street address. Later that day, a man who Ross identified as Gilan came to Ross and said he wanted the shoes immediately. Although it was against company policy, Ross permitted Gilan to take the first load of shoes in the truck Gilan had brought with him. Gilan said that he urgently needed the goods for a Columbus Day sale. Later that day, Gilan returned and took the second load of shoes.

On October 11, Gilan returned to obtain the third load. He gave Ross an envelope containing two $100 bills and said "my boss wants you to have this." Ross refused to accept the money and stated that the shoes would have to be delivered by PIE. Thereafter, Gilan called several times to confirm that the goods would be delivered to 1601 Coney Island Avenue and to inform PIE that he had men waiting for the delivery. The driver, unable to locate the address[2], saw Gilan on the street. Gilan waved him over, told him that his warehouse was "pretty jammed up" and had the driver unload the goods directly into a rented truck. Gilan signed receipts for this delivery in the name of "Gary Golden." Gilan again called the dispatcher and asked to

pick up the fourth load rather than wait for its delivery.

That same day, October 11, Ringel received a call from Levy informing him that the $320,000 check was fraudulent.[3] Ringel immediately called both PIE and the FBI and informed them about the fraudulent check. Agent Conlin of the FBI went to the PIE terminal the next day and followed the delivery truck as it delivered the fourth and final load of shoes.

The PIE truck drove to the same Coney Island Avenue location as before; once again Gilan signalled the truck to stop and unload the shoes into a rented truck. Several people, including Offer Cohen, helped unload the PIE truck. Gilan signed the delivery receipt "Gary Golden." Agent Conlin followed Gilan's truck to First Avenue in Manhattan, where Gilan met with Cohen and another person. Gilan and Cohen made calls from a pay telephone and then drove north to Westchester County. Agent Conlin pulled the truck over and found the shoes in the back. Cohen was arrested.

On October 26, 1988, Agent Conlin went to the Garnerville warehouse and opened it with a key he had recovered from Cohen's jacket pocket at the time of arrest. Inside the warehouse were 900 cartons of stolen Ciao shoes and 115 cartons of stolen Suba brand sneakers.

Gilan was arrested on November 4, 1988. At the time of his arrest, the police found, among other things, a Diner's Club credit card and an AT & T card issued to the Pitaria Restaurant, a Manhattan restaurant, in Gilan's name. Records showed that telephone calls to the Pitaria, Kleven, Asseraf, the Garnerville warehouse and OP had been charged to Gilan's home number.

## 2. The uncharged crime—the Suba sneaker theft.

By a letter dated June 14, 1990, the government notified the district court that it planned to introduce evidence regarding

---

2. The address was later shown to be nonexistent.

3. A & T Juvenile turned out to be a defunct company. The former owner testified that his checkbook had been stolen and the check fraudulently certified.

the September 1988 theft of the sneakers, also recovered in the Garnerville warehouse. The government claimed that David Kim, president of Suba, sold 375 cases of shoes to a man named "Jack" for $69,000 and the certified check used to pay for the goods turned out to be false.

Specifically, Jack told Kim that he was from a company called Azor, which was located at 1410 69th Street, Brooklyn. Kim agreed to sell Jack 9,000 pairs of Suba sneakers for $130,000. Jack left a telephone number where he could be reached; the number was for the Pitaria Restaurant. On September 2, the Friday of Labor Day weekend, Kim attempted to deliver the first shipment of sneakers to 1410 69th Street, Brooklyn, the address of the consignee. When Kim arrived at number 1410 he was met by two men who helped him unload the merchandise into a facility at 1412 69th Street. At some point, a man identifying himself as Jack arrived. Kim was given a certified check for $69,000 drawn on the account of Bloomsbury Fashion, Incorporated. Kim was told that this company was the same as Azor. The men showed Kim a second check for $50,000 and told him that he would receive this check when the second shipment was delivered. At this time, Kim and Jack signed a modified agreement concerning the remaining merchandise.

Several days later, Kim returned to 1412 69th Street with the remainder of the shoes. At that time he discovered that the building located at 1412 was empty and locked; Kim was unable to deliver the sneakers. The certified check was later returned for insufficient funds.

### 3. *The Rule 404(b) Motion and Ruling.*

The government's June 14, 1990 letter outlined the basis for its contention that the Suba theft should be admitted as a similar act pursuant to Federal Rule of Evidence 404(b). The government stated that it intended to prove the following similarities between the Ciao shoe theft and the Suba sneaker theft: 1) the same address for the purported consignee (1410 69th Street, Brooklyn); 2) use of the Pitaria restaurant as a contact point for discussions (Gilan had a Pitaria credit card, Decker of the Garnerville warehouse had been given this number as a contact location, and Kim had phoned "Jack" there many times); 3) companies named Azore International and Arzare[4] were involved in both transactions; 4) Gilan and Cohen attempted to sell both shoes and sneakers to a fellow tenant at the warehouse facility; 5) recovery of both the Ciao shoes and the Suba sneakers in the same warehouse at the same time; and 6) payment was made with a false check drawn on a defunct company.

After substantial discussion, the court found the following similarities between the two crimes: 1) theft of sneakers and shoes both involved use of a fraudulent check; 2) the purchaser of the Suba sneakers gave the telephone number of the Pitaria as a contact point and Cohen gave the same contact point to Decker (the manager of the Garnerville warehouse);[5] 3) both the shoes and sneakers were recovered from the Garnerville warehouse at the same time; and 4) in both cases, 1410 69th Street, Brooklyn, was given as an address.[6] The court stated that "[t]hose points of similarity are sufficiently startling to persuade me that a reasonable jury could find by a preponderance that the same people who took the sneakers took the shoes." Transcript at 322. Accordingly, the trial court ruled that the evidence of the Suba sneaker theft was admissible to prove various elements of the case, including knowl-

---

4. Apparently in both the shoe and sneaker thefts the company was Azor International.

5. Gilan had other connections with the Pitaria: at the time of his arrest, he had a credit card bearing the name Pitaria and the FBI had observed him at the restaurant on several occasions.

6. The government informed the court that although it had originally indicated otherwise, it would not offer any evidence that Gilan and Cohen had approached a warehouse tenant and attempted to sell him a quantity of shoes and sneakers.

edge on Gilan's part.[7] The court noted that defendants could request a limiting instruction.[8]

### Discussion

■ The trial judge is given broad discretion in making its rulings under Rules 403 and 404(b). On appeal, a ruling involving similar act evidence will be overturned only for a clear abuse of discretion. *United States v. Sappe,* 898 F.2d 878, 880 (2d Cir.1990).

In *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), the Supreme Court outlined the test for admission of other acts evidence under Rule 404(b). First, the evidence must be introduced for a proper purpose, such as proof of knowledge or identity. *See id.* at 691, 108 S.Ct. at 1502. Second, the offered evidence must be relevant to an issue in the case pursuant to Rule 402, as enforced through Rule 104(b). *Id.* Third, the evidence must satisfy the probative-prejudice balancing test of Rule 403. *Id.* Fourth, if the evidence of other acts is admitted, the district court must, if requested, provide a limiting instruction for the jury. *Id.* at 691–92, 108 S.Ct. at 1502. The Court held that the standard of proof under Rule 404(b) was whether the jury could "reasonably conclude that the act occurred and that the defendant was the actor." *Id.* at 689, 108 S.Ct. at 1501. The standard applied by the district court is preponderance of the evidence. *See United States v. Ramirez,* 894 F.2d 565, 569 (2d Cir.1990) (similar act evidence not relevant unless court determines that a jury "could reasonably find by a preponderance of the evidence

that the act occurred and that the defendant committed the act").

In this case, the first prong of the *Huddleston* test is undeniably satisfied; a proper purpose for admitting similar acts is to show a defendant's identity or knowledge.

The crux of appellant's argument is that the district court misapplied the second prong of the *Huddleston* test. Appellant maintains that there was no evidence which would support a finding by the jury that appellant committed the similar act. The government argues that the district court's mention of the four similarities between the crimes suffices to connect the uncharged crime to appellant. Essentially the government's argument is that "[o]nce the jury concluded that Gilan's undisputed acts in the Ciao events made it likely that he was involved in the Suva [sic] theft, it could then consider the impact of his acts in both thefts as bearing upon his knowledge in the charged offense." Gov't Brief at 20.

The problem with the government's analysis is that there is *no* evidence tying appellant to the Suba theft. The two crimes might very well be linked because of their striking similarities; however, nothing indicates that Gilan forms any part of that link. *See United States v. Gonzalez–Lira,* 936 F.2d 184, 189–90 (5th Cir. 1991) ("the Government must at least provide *some evidence* that the defendant committed the prior bad act"). In both cases relied on by the government, *Huddleston* and *United States v. Oshatz,* 912 F.2d 534, 542 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991), there was testimony which linked the defendant to the uncharged crime.[9]

---

**7.** The court stated that while the evidence was clearly admissible against Cohen, it was not quite so clear with respect to Gilan. The ultimate conclusion, however, was that "[t]here has been enough evidence thus far in the record to support a finding of substantial evidence pointing towards the defendant[ ] Gilan's guilt of the shoe theft to support the inference that he was also hooked in to the sneaker theft." Transcript at 317.

**8.** A limiting instruction was not requested and this is not an issue on appeal.

**9.** In *Huddleston,* defendant argued that the district court erred in admitting testimony that he had sold televisions because the government did not prove that the televisions were in fact stolen. The Court found that the district court must simply examine all the evidence in the case and decide whether the jury could reasonably find that the televisions were stolen by a preponderance of the evidence. Testimony existed which tied defendant into the earlier sale of televisions; the issue was whether the televisions were stolen.

Likewise, in *Oshatz* the defendants contended that the government had failed to show that

In the case before the court, there is nothing which would provide the proper link. Although the circumstances of the thefts are quite similar—a fraudulent certified check was used to purchase both types of footware, the deliveries took place in preparation for a holiday weekend, the 1410 69th Street address was provided as a delivery point, the merchandise was found in the same warehouse at the same time, and the Pitaria phone number was given as a contact point—absent from the equation is any evidence that Gilan was involved in the Suba theft. There was no credible evidence that Kim had ever seen or spoken with Gilan.[10] The phone records did not link Gilan to either Suba or Kim.[11] It is also important to note that in the Ciao shoe theft, Gilan's role extended to delivering the check, urging rapid delivery of the merchandise, and then picking up several deliveries of the goods. The Ciao deal was set up by Asseraf, who was in close contact with Kleven in his role as negotiator. In the Suba sneaker theft "Jack," whom the government argues is Gilan, set up the entire purchase, was present when Kim delivered the sneakers, and produced the fraudulent check. Thus, the role played by

Gilan in the Ciao shoe theft differs from Jack's role in the Suba sneaker theft; Gilan became involved in the Ciao theft only as a deliveryman whereas Jack's role extended to the negotiation stage.[12] While the jury might reasonably conclude that the two crimes were planned and arranged by the same person, there was no evidence that Gilan was that person or that he played any particular role in the uncharged crime.

In *Gonzalez–Lira*, 936 F.2d at 190, the court noted that even using the generous standard of *Huddleston*, the government did not establish a proper basis for admission of testimony concerning a prior smuggling attempt. The court noted that there was no evidence at all that it was defendant who committed the earlier offense. The court then stated that: "Because there was no showing that the prior acts to be laid before the jury were the acts of Gonzalez, the evidence was not shown to meet the threshold relevancy requirements of Rule 404(b)." *Id.* Moreover, in *United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987), we indicated that there must be some link between the defendant and the uncharged crime. *Id.* at 975.[13]

they had participated in earlier fraudulent tax schemes *with the knowledge and intent to defraud.* Thus, the issue was not whether defendants had indeed participated in these similar acts, but whether they had participated with the knowledge that they were fraudulent.

10. After testifying at trial, Kim told Agent Conlin that Gilan was Jack. The trial court summarily precluded this last-minute "identification" testimony and the government does not challenge this ruling on appeal.

11. At oral argument before this court, the government advised the court that an important link between Gilan and Suba was a series of four phone calls made on September 1, 1988 from (or billed to) Gilan's home phone to the Pitaria, and a phone call seventy-two minutes later from (or billed to) the Pitaria to the Suba office. The government argued that this series of phone calls tended to show that Gilan was involved with the Suba theft. Shortly after oral argument, the court was informed that the four calls to the Pitaria were made more than six hours *after* the call from the Pitaria to Suba. The court is not convinced that a flurry of telephone calls to the Pitaria over six hours after a call from the Pitaria to Suba connects Gilan with the sneaker theft. Moreover, this connection was argued by the government only

at oral argument; the government did not list it as a significant link before the district court or before this court prior to oral argument.

12. Gilan's attorney argued that "Jack" could have easily been Asseraf because of Asseraf's role as telephone negotiator in the Ciao crime. Moreover, on September 1, 1988, a phone call was made to Suba from M. Stoff, a place in which Asseraf was known to have conducted business.

13. In *Peterson*, defendant appealed from a conviction for possessing a check stolen from the United States mail knowing it to have been stolen. The evidence showed that a check had been mailed to a Mr. Azapian. The check was deposited in a bank account belonging to defendant and her common-law husband, Mr. Whitted. No permission was ever given to defendant which would enable her to possess or deposit the check.

A post-office document analyst testified that the writing on the check endorsement was that of defendant. Whitted testified that he had received the check from a woman for whom he had done some auto repairs and that defendant had never seen the check. The government introduced evidence that on another occasion

In this case, the district court apparently admitted the evidence of the uncharged crime because it was relevant to proving Gilan's knowledge or identity in the charged crime. *See supra*, n. 7. Later in the trial, however, in explaining what type of limiting instruction he would give if asked, the judge stated: "I think I would charge that it's admissible solely on the question of identity. That is, attempting to prove the identity of the persons who stole the sneakers and the shoes." Transcript at 444. As to Gilan, however, knowledge was clearly the issue and the uncharged crime was not probative on the issue of identity as to the charged crime. That element was undisputed. The confusion regarding the purpose of the evidence is exacerbated by the absence of an expressed application of a balancing test between the probative value and the prejudicial impact of the evidence. Although the district court "need not mechanically recite the Rule 403 formula as a prerequisite to admission," *Ramirez*, 894 F.2d at 569, as to Gilan the possible prejudicial effect of the Suba theft does not appear to have been weighed against its probative value in a useful way.

■ The lack of evidence linking Gilan to the Ciao shoe theft and the absence of a proper Rule 403 balancing test necessitates reversal. Clearly the error here was not harmless. There was no direct evidence of Gilan's knowledge. Knowledge might be inferred from the totality of his actions, but the admission of the evidence of the prior theft would certainly have figured prominently in the jury's consideration of this issue.

### Conclusion

Accordingly, we hold that the Rule 404(b) evidence should not have been admitted

because there was no link between appellant and the Suba sneaker theft. The absence of this link means that in spite of the similarities of the crimes, the jury could not infer appellant's knowledge and intent based on the Suba theft. This case is remanded for a new trial.

defendant had forged the endorsement of a Ms. Williams on an earlier check. The support for admitting this prior similar act was first, the actual Williams check (the physical exhibit), and second, the testimony of the document analyst that the endorsement was that of defendant. Although the government told the district judge that it had information that Ms. Williams had never received the check, no evidence was offered to that effect. Moreover, no evidence was offered that defendant had not been given authority to possess or endorse the check.

We concluded that the Williams check should not have been admitted because its "very slight probative value as evidence of knowledge that the Azapian check was stolen was so far outweighed by its potential for undue prejudice that its admission was an abuse of discretion." *Id.* at 973, 975–76. Although we rejected the evidence under the third prong of the *Huddleston* test, the logic is equally applicable to the case before us today.