SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-09-0224-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2005-127282-001 SE |
| RODNEY EUGENE HARDY, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Michael W. Kemp, Judge

**AFFIRMED**
_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                Phoenix
    By   Kent E. Cattani, Chief Counsel
         Criminal Appeals/Capital Litigation Section
         Julie A. Done, Assistant Attorney General
Attorneys for the State of Arizona

DROBAN & COMPANY PC                                       Anthem
    By   Kerrie M. Droban
Attorney for Rodney Eugene Hardy
_____

**P E L A N D E R**, Justice

¶1      A jury found Rodney Hardy guilty of first degree burglary, kidnapping, and two counts of first degree murder. He was sentenced to death on both murder counts and to prison terms on the other counts. We have jurisdiction over his appeal under Article 6, Section 5(3) of the Arizona Constitution and A.R.S.

1

§ 13-4031 (Supp. 2011).[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶2        On Thursday, August 25, 2005, Hardy's wife Tiffany Lien called her friend Meleigha and said she needed a place to stay.[2]  Meleigha told Tiffany that she could move in with her, but Tiffany did not stay with her that night.

¶3        The next day, Hardy slapped Tiffany, and she left their apartment.  That afternoon, Hardy asked his son to keep Hardy's gun because "he didn't need any drama," but Hardy retrieved the gun that night.  Hardy also went to a club that evening and told the bartender, "my baby is gone," and he "could kill them both."  That same night, Tiffany went out with Meleigha, Julius, and Don.  Tiffany and Don were romantically involved.

¶4        Hardy left a message on Meleigha's cell phone shortly after midnight on Saturday, August 27, saying that he knew where Tiffany was, whom she was with, and what vehicle they were driving.  When Hardy called again, Meleigha handed the phone to Tiffany, and Hardy and Tiffany argued.  During that call or a subsequent one, Tiffany handed the phone to Don, who also argued

---

[1]     In this opinion, we cite the current version of statutes that have not materially changed since the events at issue.

[2]     We present the facts in the light most favorable to sustaining the jury's verdicts.  *State v. Chappell*, 225 Ariz. 229, 233 ¶ 2 n.1, 236 P.3d 1176, 1180 n.1 (2010).

2

with Hardy.

¶5     Later that weekend, Hardy visited his friend Krystal. He was intoxicated and upset, saying "she's gone and I don't know what to do," and "it's too late for her to come back."

¶6     On Sunday, August 28, shortly after midnight, Meleigha, Julius, Tiffany, and Don went to Meleigha's apartment. Eventually, Meleigha and Julius went to Meleigha's bedroom, and Tiffany and Don went to a second bedroom further down the hall.

¶7     At approximately 4 a.m., Meleigha went outside and downstairs to a vending machine. While she was there, Hardy came up behind her and then pushed her up the stairs and into her apartment. He followed and headed down the hallway. When Hardy paused at the first bedroom door, Meleigha shouted, "That's my boyfriend." Hardy continued to the second bedroom, opened the door, cocked a gun, and started shooting. Julius and Meleigha ran out of the apartment, hearing several shots as they fled.

¶8     When police arrived at Meleigha's apartment, Tiffany and Don were unresponsive. Tiffany had been shot twice, once in the head and once in the neck. Don had been shot several times — in his left hand, both shoulders, chest, and forehead. Both died at the scene.

¶9     On Monday, August 29, Hardy turned himself in to police. He was indicted on two counts of first degree murder,

3

first degree burglary, attempted kidnapping of Tiffany, and kidnapping of Meleigha. The State later dropped the attempted kidnapping charge. Hardy testified at trial and admitted that he shot Tiffany and Don, but claimed that he committed manslaughter in the heat of passion, not first degree murder.

¶10    The jury returned guilty verdicts on all counts and found two aggravating circumstances under A.R.S. § 13-751: (F)(2) (prior serious offense), and (F)(8) (multiple homicides). After finding Hardy's mitigation not sufficiently substantial to call for leniency, the jury determined that death was the appropriate sentence for each of the murders. The trial court also sentenced Hardy to two consecutive sentences of life imprisonment with the possibility of parole after twenty-five years for the kidnapping and burglary convictions.

## II. ISSUES ON APPEAL

### A. Jury selection

¶11    Hardy argues that the trial court erred in denying his challenges, based on *Batson v. Kentucky*, 476 U.S. 79 (1986), to the State's peremptory strikes of two minority jurors. We review for clear error. *State v. Gallardo*, 225 Ariz. 560, 565 ¶ 10, 242 P.3d 159, 164 (2010).

¶12    Racially discriminatory use of a peremptory strike violates the Equal Protection Clause of the Fourteenth

4

Amendment.  *Batson*, 476 U.S. at 89.[3]  A *Batson* challenge involves three steps:  (1) The defendant must make a prima facie showing of discrimination, (2) the prosecutor must offer a race-neutral reason for each strike, and (3) the trial court must determine whether the challenger proved purposeful racial discrimination. *Gallardo*, 225 Ariz. at 565 ¶ 11, 242 P.3d at 164.  In the third step, the trial court evaluates the striking party's credibility, considering the demeanor of the striking attorney and the excluded juror to determine whether the race-neutral rationale is a pretext for discrimination.  *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).  "Although not dispositive, the fact that the state accepted other minority jurors on the venire is indicative of a nondiscriminatory motive."  *Gallardo*, 225 Ariz. at 565 ¶ 13, 242 P.3d at 164 (internal quotation marks and alterations omitted).

¶13      By asking the prosecutor to give race-neutral reasons

---

[3]      Hardy asserts on appeal that denial of his *Batson* challenge violated his rights to an impartial jury, fair trial, and due process, citing the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article 2, sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. But *Batson* and its progeny rest on equal protection grounds, and Hardy relies solely on those cases.  Arguments must contain "the contentions . . . and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Ariz. R. Crim. P. 31.13(c)(vi).  We therefore limit our review to the Equal Protection Clause of the Fourteenth Amendment and do not consider additional, unsupported constitutional claims. *See State v. Bocharski*, 218 Ariz. 476, 486 ¶ 41 n.9, 189 P.3d 403, 413 n.9 (2008).

for striking minority Jurors 10 and 29, the trial court implicitly found that Hardy made a prima facie showing of discrimination. The prosecutor said he struck Juror 10 because he believed that (a) she was predisposed to favor a life sentence based on long-held beliefs that had only recently changed, and (b) her brothers' drug addictions could make her sympathetic to Hardy's mitigation relating to familial drug abuse. Hardy argued that a non-minority juror was similarly situated and not stricken. The prosecutor distinguished the non-minority juror, who did not have a strong opinion on the death penalty and whose father had been convicted of possessory drug crimes and, according to that juror, had been treated fairly by the state.

¶14 The prosecutor stated that he struck Juror 29 because she previously had been adamantly opposed to the death penalty, was combative with the prosecutor, believed a person could not put feelings aside, cringed at the phrase "an eye for an eye," and expressed a preference for a life sentence. Again, Hardy argued that a non-minority juror was similarly situated and yet was not stricken. The prosecutor distinguished that non-minority juror, who merely wished the death penalty were not needed, but did not expressly oppose it. Additionally, the record does not suggest that the non-minority juror was combative with anyone or recoiled at any point during voir dire.

6

¶15     The trial court found no "pattern of racial presence [sic] or exclusion," noting that the defense struck five minority jurors while the State struck only two. Additionally, three minority jurors remained on the panel. The trial court did not clearly err in rejecting Hardy's *Batson* challenges.

**B.   Guilt phase**

   **1.   Sufficiency of the evidence**

¶16     On the two murder counts, the State argued that Hardy was guilty of both premeditated and felony murder. At the close of the State's case in chief, Hardy moved for a judgment of acquittal on the kidnapping and burglary charges, which also served as the predicate offenses for the felony murder theory. He also moved for a judgment of acquittal on felony murder, arguing that the State failed to prove that he committed the shootings to further the kidnapping or burglary. Hardy argues that the trial court erred in denying those motions.

¶17     A judgment of acquittal is appropriate "if there is no substantial evidence to warrant a conviction." Ariz. R. Crim. P. 20(a); *see State v. West*, 226 Ariz. 559, 561 ¶ 8, 562 ¶ 14, 250 P.3d 1188, 1190, 1191 (2011). "Substantial evidence is that which reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt." *State v. Davolt*, 207 Ariz. 191, 212 ¶ 87, 84 P.3d 456, 477 (2004). We review the denial of a motion for a judgment of acquittal de novo, viewing

the evidence in the light most favorable to sustaining the verdict. *West*, 226 Ariz. at 562 ¶ 15, 250 P.3d at 1191.

### a. Kidnapping

¶18 "A person commits kidnapping by knowingly restraining another person with the intent to . . . aid in the commission of a felony." A.R.S. § 13-1304(A)(3). "'Restrain' means to restrict a person's movements without consent, without legal authority, and in a manner [that] interferes substantially with such person's liberty, by . . . moving such person from one place to another . . . . Restraint is without consent if it is accomplished by[] [p]hysical force, intimidation or deception." A.R.S. § 13-1301(2).

¶19 The record reflects substantial evidence that Hardy knowingly restrained Meleigha. She testified that Hardy "just appeared" from behind her while she was using a vending machine. He grabbed her by the back of her neck and arm, and she "just started going upstairs" because he was holding her firmly enough to direct her movement. He took her "up to [her] apartment" and "pushed [her] in the living room and just started walking back to the bedrooms." The jury saw photographs of bruises on Meleigha's neck and arms that she testified were caused by Hardy. The jury also heard an audio recording of Meleigha's 911 call, in which she told the operator, "He got me when I was down there, and he made me go up . . . . He had the gun to my back."

The operator asked, "So did he like physically grab you," and Meleigha responded, "Yes, he grabbed me."

¶20     The evidence further established that Hardy restrained Meleigha with the intent to aid his commission of a felony, that is, to injure or kill Tiffany and Don.  Hardy searched for Tiffany before the murders, and told a bartender he could "kill them both."   After speaking to Don on the telephone, Hardy retrieved his gun from his son before going to Meleigha's apartment.  He took the gun into the apartment and shot the victims several times.  Viewed in the light most favorable to sustaining the verdict, the record reflects sufficient evidence to support the kidnapping conviction.

### b.   First degree burglary

¶21     A person commits burglary in the first degree by "entering or remaining unlawfully in . . . a residential structure with the intent to commit . . . any felony therein," and "knowingly possess[ing] . . . a deadly weapon . . . in the course of committing any theft or any felony."   A.R.S. §§ 13-1507 to 1508.

¶22     The record reflects sufficient evidence to show that Hardy unlawfully entered Meleigha's residence.   He pushed Meleigha into her apartment and, with neither invitation nor consent, went down the hallway toward the bedrooms.   Hardy knowingly took a gun into the apartment.   The evidence showed

9

that Hardy entered the apartment intending to confront and shoot Tiffany and Don. *See supra* ¶ 20. Substantial evidence thus supports the burglary conviction.

### c. Felony murder

¶23 A person is guilty of felony murder if he "commits or attempts to commit . . . kidnapping under § 13-1304, [or] burglary under § 13-1506, 13-1507 or 13-1508 . . . and, in the course of and in furtherance of the offense . . . causes the death of any person." A.R.S. § 13-1105(A)(2). "A death is in furtherance when it results from any action taken to facilitate the accomplishment of the predicate felony." *State v. Lacy*, 187 Ariz. 340, 349-50, 929 P.2d 1288, 1297-98 (1996) (internal quotation marks and alteration omitted); *see also State v. Arias*, 131 Ariz. 441, 443, 641 P.2d 1285, 1287 (1982) (distinguishing death that facilitates criminal objective of underlying felony from death that results from commission of predicate crime, and concluding the former is not required by § 13-1105(A)(2)).

¶24 Hardy argues generally that he did not commit the murders to further kidnapping or burglary. Indeed, he argues, the murders could not have facilitated the kidnapping because that offense had ended before the shootings occurred. Neither argument is persuasive.

¶25 In *State v. Moore*, the defendant, like Hardy,

10

committed a burglary in order to kill the victims inside a residence. 222 Ariz. 1, 6 ¶¶ 6-9, 12 ¶ 49, 213 P.3d 150, 155, 161 (2009). We upheld the felony murder convictions, rejecting Moore's contention that those convictions "cannot be based on a burglary intended solely to murder the victim." *Id.* at 14 ¶ 62, 213 P.3d at 163. We held that felony murder may "be predicated on a burglary that is based on the intent to murder"; it does not "require the predicate offense to be separate or independent from the homicide." *Id.* at ¶¶ 61-62.

¶26 That reasoning pertains here and leads to the same result. Because Arizona's felony murder statute applies when the predicate offense of burglary is undertaken with the intent to murder the victim, it follows that the statute likewise applies if the predicate offense is kidnapping based on intent to aid in committing a murder. *See* A.R.S. §§ 13-1105(A)(2), -1304(A)(3), -1507(A), -1508(A). And because the victims' deaths resulted from Hardy's actions taken to facilitate his accomplishment of the predicate felonies, the deaths were in the course of and in furtherance of those offenses. *See Lacy*, 187 Ariz. at 349-50, 929 P.3d at 1297-98; *Arias*, 131 Ariz. at 443, 641 P.2d at 1287.

¶27 Hardy's argument that the predicate felonies were too far removed from the murders also fails. A predicate felony that "transpired immediately preceding [a] shooting," when "the

11

shooting occurred in rapid sequence and as a part of the chain of events which defendant's deliberate acts set in motion," is not so far removed from a death that it precludes a finding of felony murder. *State v. Hitchcock*, 87 Ariz. 277, 280, 350 P.2d 681, 683 (1960). Even if the kidnapping ended when Hardy released Meleigha,[4] that fact does not change the result. Hardy pushed Meleigha up the stairs, entered the apartment, immediately walked down the hallway, located Tiffany and Don, and began to shoot. The "shooting occurred in rapid sequence and as a part of the chain of events" of Hardy's other felonious actions. *Hitchcock*, 87 Ariz. at 280, 350 P.2d at 683. The trial court did not err in denying Hardy's motion for judgment of acquittal.

## 2. First degree murder verdict forms

¶28        Hardy requested, but the trial court denied, alternate verdict forms for first degree murder. The trial court acknowledged that this Court has urged the use of alternate verdict forms when the state alleges both premeditated and felony murder, but nonetheless opted to use a single verdict form without differentiation.

¶29        We have strongly urged trial courts to use alternate

---

[4]        The burglary had not ended when Hardy shot the victims because he was "remaining unlawfully" in Meleigha's apartment at that time. A.R.S. § 13-1507(A).

12

forms of verdict when the state presents alternate theories of premeditated and felony murder. *State v. Smith*, 160 Ariz. 507, 513, 774 P.2d 811, 817 (1989) (noting that the "great benefit" for the "sound administration of justice and efficiency in processing murder cases" supports submitting alternate forms of verdict to the jury). But *Smith* "did not change the substantive rule that it [is] not error to have one form of verdict for first degree murder even though both premeditation and felony murder [are] being submitted to the jury." *State v. Schad*, 163 Ariz. 411, 417, 788 P.2d 1162, 1168 (1989) (noting that "first degree murder is only one crime" and "the defendant is not entitled to a unanimous jury verdict on the precise manner in which the act was committed"), *aff'd*, 501 U.S. 624 (1991); *see also State v. Garza*, 216 Ariz. 56, 67 ¶ 46 n.11, 163 P.3d 1006, 1017 n.11 (2007). However, if a jury's verdict is based, "in whole or in part, on [an] impermissible felony murder theory" and the trial court did not provide separate verdict forms to show whether the jury found premeditated rather than felony murder, we will reverse the conviction and remand for a new trial on the premeditation theory alone. *State v. Lopez*, 158 Ariz. 258, 264, 266, 762 P.2d 545, 551, 553 (1988).

¶30　　　Relying on *Lopez*, Hardy argues that the trial court erred in failing to give two forms of verdict because the evidence failed to support either predicate offense for felony

murder. As discussed above, however, substantial evidence supports the convictions on both predicate offenses in this case. Therefore, Hardy was not entitled to a unanimous decision on the precise manner in which the murders were committed, and the trial court did not err in denying Hardy's request to use separate verdict forms for first degree murder.

¶31 Again, however, the best practice is to submit alternate verdict forms to the jury when the state presents alternate theories of first degree murder. We encourage trial courts to do so. A clear record of the jury's findings enables both parties to focus their arguments on appeal and serves the goal of judicial economy by avoiding the need to remand in cases like *Lopez*.

### 3. Other act evidence

¶32 Hardy argues that the trial court abused its discretion by admitting evidence of other acts that occurred on the weekend of the murders. Before trial, the State moved under Rule of Evidence 404(b) to introduce evidence of Hardy's actions during the few days before the murders to show intent and as intrinsic evidence. Specifically, the State proffered evidence that Hardy argued with and slapped Tiffany; that she left him, and he was searching for her; that he gave a gun to his son and later retrieved it; and that he made the statements, "My baby is gone," and "I could kill them both." Hardy opposed the State's

14

motion, asserting that the evidence would be used improperly to show that, because he had acted violently or threatened violence before the murders and carried a gun, he must have acted in conformity with his character and acted violently by shooting Tiffany and Don.

¶33     During argument on the motion, the State emphasized that the evidence was relevant to show intent because Hardy's defense — based primarily on absence of premeditation — had put that element at issue. The trial court agreed, finding the evidence admissible to show intent under Rule 404(b).[5]

¶34     Rule 404(b) governs admission of other act evidence and provides as follows:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The purpose of Rule 404(b) is "'to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person.'" *State v. Ferrero*, 229 Ariz. 239, 244 ¶ 23, 274 P.3d 509, 514 (2012) (quoting *United States v. Green*, 617 F.3d

---

[5]     Although the State argued below and on appeal that the proffered evidence was admissible as intrinsic evidence, the trial court did not admit the evidence on that ground. At oral argument, the State conceded that the trial court's ruling was correct under our recent decision in *State v. Ferrero*, 229 Ariz. 239, 243 ¶ 20, 274 P.3d 509, 513 (2012).

15

233, 249 (3d Cir. 2010)).

¶35     If offered for a non-character purpose, other-act evidence "may be admissible under Rule 404(b), subject to Rule 402's general relevance test, Rule 403's balancing test, and Rule 105's requirement for limiting instructions in appropriate circumstances." *Ferrero*, 229 Ariz. at 242 ¶ 12, 274 P.3d at 512. Before admitting evidence of other acts, a trial judge must find clear and convincing evidence that the defendant committed the act. *State v. Anthony*, 218 Ariz. 439, 444 ¶ 33, 189 P.3d 366, 371 (2008) (citing *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997)). We review a trial court's Rule 404(b) ruling for an abuse of discretion. *State v. Andriano*, 215 Ariz. 497, 502 ¶ 17, 161 P.3d 540, 545 (2007), *abrogated in part on other grounds by Ferrero*, 229 Ariz. at 243 ¶ 20, 274 P.3d at 513.

### a.    Altercation with Tiffany; looking for Tiffany

¶36     In addition to opposing the State's motion in limine, Hardy objected at trial to the anticipated testimony of Hardy's friend, Krystal, that Tiffany had left because Hardy slapped her. The court overruled the objection, finding the testimony relevant to Hardy's state of mind.

¶37     Krystal testified that, a day or two before the murders, Hardy told her that Tiffany had left because "he had hit her," that he "kept repeating that she was gone and he was

16

upset," and that he "wanted to find Tif" and would do anything to locate her. The court gave a limiting instruction after the testimony. At the close of the guilt phase, the court further instructed the jurors that they could consider other acts only if they found the State had proved by clear and convincing evidence that the defendant committed the acts, and that those acts were to be considered only to establish the defendant's motive or intent.

¶38 Evidence that a defendant was searching for the victim shortly before the crime is admissible to show plan or intent. *See* Ariz. R. Evid. 404(b). Evidence of prior argument with or violence toward a victim is likewise admissible to show motive or intent. *Id.; see also State v. Wood*, 180 Ariz. 53, 62, 881 P.2d 1158, 1167 (1994) (evidence of prior physical abuse and threats was admissible to show motive and intent when defense was lack of motive to kill and impulsivity); *State v. Sparks*, 147 Ariz. 51, 55-56, 708 P.2d 732, 736-37 (1985) (alleged feud with victim was proper to prove retaliation motive); *State v. Jeffers*, 135 Ariz. 404, 418-19, 661 P.2d 1105, 1119-20 (1983) (prior attack showing malice toward victim was relevant to prove motive and intent and to rebut defense of love and inability to harm victim).

¶39 Hardy argues that the slap revealed marital discord rather than motive or intent and cites *United States v.*

17

*Peterson*, 808 F.2d 969 (2d Cir. 1987), to support his assertion that a single slap is insufficient to prove intent. In *Peterson*, however, the issue was not that a single prior act was proffered, but that the government failed to provide sufficient background to support a necessary inference. 808 F.2d at 975. In this case, there was no such failure. Krystal's testimony was relevant to prove motive and intent, and to rebut Hardy's defense theory.

¶40    Hardy's argument that the trial court should have excluded Krystal's testimony as unfairly prejudicial is also unavailing. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Ariz. R. Evid. 403. "Unfair prejudice means an undue tendency to suggest decision on an improper basis, . . . such as emotion, sympathy or horror." *State v. Schurz*, 176 Ariz. 46, 52, 859 P.2d 156, 162 (1993) (internal quotation marks omitted). Here, the trial court could reasonably find that the evidence of Hardy hitting Tiffany was more probative than prejudicial because Hardy's motive and intent were significant issues at trial. Further, the court expressly instructed the jury to not consider the evidence to determine the defendant's character or that he acted in conformity therewith. The trial court did not abuse its discretion in admitting Krystal's testimony about Hardy's statements.

### b. Surrendering and retrieving a gun

**¶41** Hardy's son Jason testified that on Friday afternoon, August 26, 2005, Hardy asked Jason to keep his gun because "he didn't need any drama." Later that evening, Hardy retrieved the gun. Hardy argues that this testimony was used to show his disposition toward criminality – presumably because he was a prohibited possessor, a fact alluded to during the guilt phase by Hardy himself in explaining why he initially relinquished the gun. But Hardy's surrender and retrieval of the gun show that he consciously chose to carry a deadly weapon that weekend. Thus, the evidence was relevant and admissible to prove he intended to kill the victims.

**¶42** The trial court did not err in implicitly finding the evidence not unduly prejudicial because it is not highly evocative and was unlikely to compel jurors to decide the case based on emotion, sympathy, or horror. *See Schurz*, 176 Ariz. at 52, 859 P.2d at 162. Additionally, the court's limiting instruction at the close of the guilt phase alleviated any potential prejudice.

### c. Statements to bartender

**¶43** The State called a former bartender who testified that two days before the murders Hardy came to her bar in tears and told her, "My baby is gone . . . . [S]he's really gone this time," and he "could kill them both." It is not clear that such

testimony constitutes "evidence of other crimes, wrongs, or acts," nor was the evidence offered to prove Hardy's character "in order to show action in conformity therewith." Ariz. R. Evid. 404(b); *compare State v. Huerstel*, 206 Ariz. 93, 106 ¶ 69, 75 P.3d 698, 713 (2003) (testimony about defendant's stated plans to rob store on weekend of murders was not evidence of his conduct, and therefore not subject to Rule 404(b)), *with State v. Nordstrom*, 200 Ariz. 229, 247–48 ¶¶ 52-57, 25 P.3d 717, 735–36 (2001) (applying Rule 404(b) to admission of defendant's statements soliciting another person to commit a crime two years before the offense at issue). But if Rule 404(b) applies to the bartender's testimony, that evidence clearly was relevant and admissible to prove Hardy's intent, plan, or knowledge. *See* Ariz. R. Evid. 401, 402, 404(b); *see also State v. Dickey*, 125 Ariz. 163, 167, 608 P.2d 302, 306 (1980) (ruling that defendant's statement weeks before shooting, "If anybody ever messes with me, I'll blow them away," was relevant to prove premeditation). And the evidence was not barred by the hearsay rule, *see* Ariz. R. Evid. 801(d)(2)(A), 803(3), nor was its probative value substantially outweighed by the danger of unfair prejudice, Ariz. R. Evid. 403.

¶**44** Hardy argues that his statements to the bartender are not reliable because they were made while he was drinking, were incomprehensible to her, and were remote in time. To the extent

any evidence supports this argument, it goes to the weight rather than admissibility of the testimony. And even though the bartender might not have known to whom Hardy was referring when he made the statement that he could kill them both, there is nothing inherently ambiguous or incomprehensible about the statement.

¶45 Hardy also asserts that the bartender heard of the statements from a third party rather than from Hardy himself. But each of the statements introduced into evidence was made by Hardy directly to the bartender. Although the bartender allegedly heard from a co-worker other statements Hardy made that night, evidence of those statements was not presented at trial. The trial court did not abuse its discretion in admitting the bartender's testimony about Hardy's statements to her.

### 4. Personal history evidence

¶46 During her opening statement in the guilt phase, defense counsel told the jury that Hardy was born to a heroin-addicted prostitute who had an abusive pimp, and that Hardy had certain cognitive impairments as a result of witnessing that drug abuse and violence. The prosecutor objected on relevance grounds. At a side-bar conference, the defense argued that the jury would have to determine whether Hardy thought Don was Tiffany's pimp or lover to assess his contention that he was

21

attempting to keep her safe, not to track her down to kill her. Defense counsel also stated that, to support Hardy's self-defense theory, he intended to tell the jury that Hardy had been previously shot nine times as a result of a love triangle and was consequently disabled. The trial court sustained the State's objection, ruling that information about the mother's pimp and the shooting in which Hardy was injured twenty-four years earlier was too remote and irrelevant.[6]

¶47    Before Hardy testified, the defense again challenged the court's ruling. Hardy argued that to rebut the State's theory of premeditation he must be able to support a theory of self defense, second degree murder, or manslaughter by testifying that having witnessed his mother's altercations with pimps predisposed him to fear pimps on behalf of women he cared for, and that his disability from having been shot nine times by a woman's jealous boyfriend would prevent him from taking on a 300-pound individual like Don.

¶48    The court overruled Hardy's objection, finding that the probative value was diminished because the proffered evidence was remote and uncorroborated, and the prejudicial impact far outweighed this attenuated value. The court,

---

[6]    The exclusion of Hardy's personal-history evidence was limited to the guilt phase. During the penalty phase, the evidence was admitted without objection.

22

however, allowed Hardy "to explain that he does have physical limitations, and that he has injuries that prevent him from being mobile." Additionally, Hardy testified without objection about his care and love for Tiffany and his knowledge of Don's reputation for violence. Hardy argues that exclusion of his personal-history evidence hindered his ability to present a viable defense.

**¶49** A defendant's constitutional right to present a defense "is limited to the presentation of matters admissible under ordinary evidentiary rules." *State v. Dickens*, 187 Ariz. 1, 14, 926 P.2d 468, 481 (1996), *abrogated in part on other grounds by Ferrero*, 229 Ariz. at 243 ¶ 20, 274 P.3d at 513; *see also Taylor v. Illinois*, 484 U.S. 400, 410, 411 n.15 (1988). To be admissible, evidence must be relevant, Ariz. R. Evid. 401, and its probative value must not be substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence, Ariz. R. Evid. 403. As probative value diminishes, the potential increases that it will be substantially outweighed by the dangers identified in Rule 403. *Cf. United States v. Rewald*, 889 F.2d 836, 853 (9th Cir. 1989) (considering Federal Rule of Evidence 403). We review a trial court's determination of relevance and admissibility of evidence for an abuse of discretion. *State v. Rutledge*, 205 Ariz. 7, 10

23

¶ 15, 66 P.3d 50, 53 (2003).

¶**50**      Assuming that the proffered evidence was relevant to prove Hardy's state of mind, the trial court could reasonably find it inadmissible under Rule 403.  Any probative value was greatly reduced because the evidence related to remote events that did not involve any victim of the crimes at issue.  Evidence of Hardy's mother's prostitution or an unrelated gun battle could confuse the issues or mislead the jury by shifting the focus away from the defendant's alleged assaults on the victims.  *See United States v. Chase*, 451 F.3d 474, 480 (8th Cir. 2006); *State v. Larose*, 554 A.2d 227, 231 (Vt. 1988).

¶**51**      To the extent Hardy's proffered evidence was relevant to support the theory that he intended to protect Tiffany, it called for uncorroborated speculation that Don was Tiffany's pimp.  Thus, testimony of his mother's violent incidents with pimps also could confuse the issues and lead the jury to base its determination on conjecture and unsound reasoning.  *See United States v. Iron Hawk*, 612 F.3d 1031, 1040 (8th Cir. 2010). In sum, the trial court did not abuse its discretion in excluding Hardy's proffered personal-history evidence during the trial's guilt phase.

### 5.  Jail garb

¶**52**      Hardy argues that the trial court abused its discretion in denying his motion for a mistrial after three

24

jurors inadvertently saw him during the guilt phase exiting an elevator accompanied by law enforcement officers and wearing jail garb. Mistrial "is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Dann (Dann I)*, 205 Ariz. 557, 570 ¶ 43, 74 P.3d 231, 244 (2003). We review the denial of a motion for mistrial for abuse of discretion. *State v. Speer*, 221 Ariz. 449, 462 ¶ 72, 212 P.3d 787, 800 (2009).

¶53 Following deliberations in the guilt phase, three jurors saw Hardy in a wheelchair being rolled out of a freight elevator by officers. Hardy contends that he was wearing handcuffs and jail garb at the time. Two of those jurors noticed that he was wearing jail garb, but none noticed whether he was in handcuffs because, as soon as they recognized Hardy, the jurors closed a hallway door and waited for him to pass. One of these jurors mentioned to the rest of the jury panel that they had seen Hardy but did not mention what he was wearing.

¶54 Generally, a defendant in a criminal case has a right to appear in civilian clothing and be free from visible restraints in the courtroom during trial. *Deck v. Missouri*, 544 U.S. 622, 629 (2005) (visible restraints); *Estelle v. Williams*, 425 U.S. 501, 504-06 (1976) (jail garb); *State v. Gomez*, 211 Ariz. 494, 502–03 ¶¶ 40–41, 123 P.3d 1131, 1139–40 (2005)

25

(visible restraints); *State v. Garcia-Contreras*, 191 Ariz. 144, 146-47 ¶ 8, 953 P.2d 536, 538-39 (1998) (jail garb). Violation of these rights requires reversal unless the state can show harmless error. *Deck*, 544 U.S. at 635; *State v. Reid*, 114 Ariz. 16, 23, 559 P.2d 136, 143 (1976). A juror's inadvertent exposure to the defendant in handcuffs outside the courtroom, however, "is not inherently prejudicial, and a defendant is not entitled to a new trial absent a showing of actual prejudice." *Speer*, 221 Ariz. at 462-63 ¶¶ 74-75, 212 P.3d at 800-01 (internal quotation marks omitted) (one juror); *State v. Apelt*, 176 Ariz. 349, 361, 861 P.2d 634, 646 (1993) (several jurors). This reasoning also applies to a juror's inadvertent exposure to the defendant in jail garb.

¶55    In this case, there was no showing of actual prejudice. The jurors who saw Hardy assured the trial court that they could be fair and impartial through the aggravation and penalty phases of the trial. After this assurance, Hardy withdrew a motion to replace those three jurors with alternates and indicated that "if the court fe[lt] there [was] prejudice" it should select an entirely new jury. The trial court reasonably found no prejudice relating to the three jurors who saw Hardy, and there could be no prejudice regarding the other jurors who neither saw nor knew of his jail attire. The trial court did not abuse its discretion in denying the motion for

26

mistrial.

## C.    Sentencing phase

### 1.    Refusal of *Simmons* instruction

¶56     During the penalty phase, Hardy filed two motions requesting the trial court to instruct the jury that if it returned life sentences on the murder convictions, Hardy would not be eligible for release on those counts after twenty-five years because of the pending sentences on the kidnapping and burglary convictions, and that he would be eligible for potential release only through executive clemency.  He claims error in the trial court's denial of the requested instructions.

¶57     We review the legal adequacy of a jury instruction de novo, *State v. Cota*, 229 Ariz. 136, 151 ¶ 77, 272 P.3d 1027, 1042 (2012), and find no error.

¶58     Due process requires a court to inform a capital jury that a defendant is ineligible for parole if the defendant's future dangerousness is in issue and state law prohibits his release on parole.  *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994).   But *Simmons* instructions are not required when "[n]o state law . . . prohibit[s the defendant's] release on parole." *State v. Cruz*, 218 Ariz. 149, 160 ¶ 42, 181 P.3d 196, 207 (2008); *see also Ramdass v. Angelone*, 530 U.S. 156, 166 (2000) (plurality opinion).   In a capital case involving an adult victim, A.R.S. § 13-751 provides for the possibility of a life

sentence with release after twenty-five years. The jury instruction given accurately stated the law. *See State v. Chappell*, 225 Ariz. 229, 240 ¶ 42, 236 P.3d 1176, 1187 (2010). No *Simmons* instruction was required.

### 2. Improper testimony

¶59 The trial court denied Hardy's motion for a mistrial after the prosecutor challenged on cross-examination the opinion of Dr. Cunningham, a defense psychologist, that Hardy would "likely adjust to a life term in prison without serious violence." Although not asserting any prosecutorial misconduct, Hardy argues that the court abused its discretion in denying that motion because the prosecutor's exchange with the expert constituted improper testimony.

¶60 On cross-examination, the prosecutor established that Dr. Cunningham had testified as an expert for Leroy Cropper, another capital defendant. The following exchange ensued:

STATE: Prison did not work for Brent Lumley did it?

CUNNINGHAM: Yes, sir. When I say "prison works" that means to keep violence from happening in prison. I didn't address the issue of how it works in terms of rehabilitating individuals or how long they need to be held . . . . I addressed that it works to profoundly limit the frequency of serious violence under a population that is already at risk. That's how prison works.

STATE: Okay. I want you to listen to my question again. Prison didn't work for Brent Lumley did it?

DEFENSE COUNSEL: Objection, [Y]our Honor. Relevance.

28

We don't even know who Brent Lumley is in this context. And he has lack of personal knowledge. . . .

COURT: If you know — if you have any personal knowledge?

CUNNINGHAM: The name is familiar but I don't have personal knowledge. And prison works for keeping people safe in prison for reducing the incidence of violence.

STATE: Brent Lumley is the prison guard that your client Leroy [Cropper] killed in prison?

DEFENSE COUNSEL: Objection, your Honor. Highly improper and irrelevant.

COURT: I'll sustain the objection.

¶61    Hardy characterizes the prosecutor's unanswered question as "improper testimony." But because Dr. Cunningham did not answer the prosecutor's question, there was no testimony that could be deemed improper. And even if we assume the question was argumentative, lacked foundation, or was otherwise improper, the trial court sustained Hardy's objection.

¶62    In addition, before the jurors deliberated at the end of the sentencing phase, the trial court instructed them that "[i]t is the duty of the Court to rule on the admissibility of evidence. You shall not concern yourselves with the reasons for these rulings. You shall disregard questions and exhibits that were withdrawn or to which objections were sustained." The court also told the jurors, "The attorneys' remarks, statements, and arguments are not evidence." Even assuming the prosecutor's

29

question was improper, we presume the jurors followed the court's instructions, which sufficiently cured any alleged prejudice. *State v. Newell*, 212 Ariz. 389, 403 ¶ 68, 132 P.3d 833, 847 (2006); *State v. Lamar*, 205 Ariz. 431, 439 ¶ 43, 72 P.3d 831, 839 (2003). The trial court did not err in denying Hardy's motion for mistrial. *Dann I,* 205 Ariz. at 570 ¶ 43, 74 P.3d at 244 (stating mistrial is "the most dramatic remedy for trial error" and should be declared only when justice would otherwise be thwarted).

## III. REVIEW OF DEATH SENTENCE

¶63 Because the murders occurred after August 1, 2002, we review the jury's finding of aggravating factors and imposition of the death sentence for an abuse of discretion. A.R.S. § 13-756(A). "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)).

## A.   Aggravating circumstances

¶64 The jury found that Hardy was previously convicted of a serious offense, A.R.S. § 13-751(F)(2), and that he was convicted of one or more other homicides that were committed during the commission of the offense, § 13-751(F)(8). Hardy

30

does not contest these findings, and the record fully supports them.

## B.    Mitigating circumstances

¶65      During the penalty phase, a juror may find any mitigating circumstance by a preponderance of the evidence and consider these findings in determining the appropriate sentence. A.R.S. § 13-751(C).  Hardy presented evidence that described the climate of poverty and violence in which he grew up and alleged that it resulted in cognitive impairment, a troubled childhood, and a lack of positive male role models.  He also alleged devotion to his family, his physical disability, and a lack of propensity for future violence.  The State presented evidence to rebut many of these mitigating circumstances.  The jury did not find the proffered mitigation sufficiently substantial to call for leniency.

¶66      We will overturn a "jury's imposition of a death sentence only if no reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Cota*, 229 Ariz. at 153 ¶ 95, 272 P.3d at 1044 (internal quotation marks omitted).  Even assuming Hardy proved each alleged mitigating circumstance, we cannot say that no reasonable juror could have concluded that the factors were not substantial enough to find a life rather than death sentence appropriate. *See id.; Chappell*, 225 Ariz.

at 242-43 ¶¶ 58-59, 236 P.3d at 1189-90; *Morris*, 215 Ariz. at 341 ¶¶ 81-82, 160 P.3d at 220. Thus, the jury did not abuse its discretion in finding the mitigation evidence insufficient to warrant leniency.

## IV. CONCLUSION

**¶67** We affirm Hardy's convictions and sentences.[7]

_____
                    A. John Pelander, Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Scott Bales, Vice Chief Justice


_____
Robert M. Brutinel, Justice

---

[7] Hardy raises eleven other claims to avoid preclusion on "subsequent review." Those claims and the decisions by this Court that he identifies as rejecting them are presented verbatim in the Appendix.

**APPENDIX**

(1) The fact-finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty. *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). The trial court's failure to allow the jury to consider and give effect to all mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments. This Court rejected this argument in [*State v.*] *McGill*, 213 Ariz. [147, 161 ¶ 59, 140 P.3d 930, 944 (2006)].

(2) By allowing victim impact evidence at the penalty phase of the trial, the trial court violated defendant's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. This Court rejected challenges to the use of victim impact evidence in *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 16, 68 P.3d 412, 417 (2003).

(3) The trial court improperly omitted from the penalty phase jury instructions words to the effect that they may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling them to assign whatever value the jury deemed appropriate. The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts." These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 15, 23, and 24 of the Arizona Constitution. This Court rejected this argument in *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-917 (2005).

(4) The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This Court rejected this argument in *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

(5) The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution. This Court rejected these arguments in *State v.*

*Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

(6) The prosecutor's discretion to seek the death penalty lacks standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, Sections 1, 4, and 15 of the Arizona Constitution. This Court rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954, 122 S.Ct. 2654, 153 L.Ed.2d 830 (2002).

(7) Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution. This Court rejected this argument in *Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1132.

(8) Proportionality review serves to identify which cases are above the "norm" of first-degree murder, thus narrowing the class of defendants who are eligible for the death penalty. The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. This Court rejected this argument in *Harrod*, 200 Ariz. at 320 ¶ 65, 26 P.3d at 503.

(9) Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence. This Court rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

(10) Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2 sec. 15 of the Arizona Constitution. This argument was rejected in *State v. Van Adams*, 194 Ariz. 408, 422, 984 P.2d 16, 30 (1999).

(11) Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).