698 P.2d 1283

Bernadette Marie LYNN, surviving spouse of Charles L. Lynn, Jr., deceased; Mary M. Baker, a widow; Claudeen Moseley, surviving spouse of Thomas Allen Moseley, deceased, for herself and as next friend and natural Guardian of the minor children of herself and Thomas Allen Moseley: Rebecca Deen Patterson (Moseley), William Davis Moseley, Benjamin Evon Moseley, Jonathan Allen Moseley, and Debra Warren (Moseley), Plaintiffs-Appellants,

v.

HELITEC CORPORATION; Globe Air, Inc.; AFG Corporation; Aircraft Specialties, Inc.; Aviation Specialties Company, Defendants-Appellees.

Nos. 1 CA–CIV 5499, 1 CA–CIV 5712.

Court of Appeals of Arizona,
Division 1, Department A.

Dec. 18, 1984.

Reconsideration Denied Feb. 12, 1985.

Review Denied April 30, 1985.

Burch & Cracchiolo, P.A. by Daniel Cracchiolo, Ian Neale, Phoenix, for plaintiffs-appellants Lynn and Moseley.

Law Office of George M. Ireland, P.C. by George M. Ireland, John R. Perry, Jr., Prescott, for plaintiff-appellant Baker.

Black, Robertshaw & Copple, P.C. by Jon R. Pozgay, Steven D. Copple, Phoenix, and Lord, Bissell & Brook by Hugh C. Griffin, Fred C. Begy III, Chicago, Ill., for defendants-appellees.

## OPINION

GRANT, Judge.

This appeal involves three consolidated wrongful death actions arising out of a May 11, 1975 airplane crash near Falcon Field in Mesa, Arizona. The plane crashed shortly after takeoff, killing all aboard including Charles Lynn, Thomas Moseley, and Basil Baker. After a lengthy jury trial the trial court entered judgment on a jury verdict in favor of the defendants-appellees.

On appeal the appellants raise two issues:

(1) Whether the trial court erred in precluding use of the pre-trial deposition of appellees' expert witness, Charles Carel, for cross-examination purposes;

(2) Whether the trial court erred in excluding testimony of Calvin Frieswyk.

## FACTS

The essential facts are: In 1973 appellee Aviation Specialties purchased the Super Constellation L–1049, designated N45516, from the City of Anchorage, Alaska. The plane remained in Anchorage for some time. In the summer of 1974 engines number two and three [1] were replaced. In August of that year the aircraft was flown to Falcon Field in Mesa. The plane did not fly again until a May 6, 1975 test flight.

Prior to the test flight Aviation Specialties ordered the installation of an anti-detonation injection (ADI) system. This system is designated to improve the cooling process in the engines and to enable the plane to use 100/130 octane fuel. Use of the ADI system generates more power with a lower grade fuel than would otherwise be feasible.

After the May 6, 1975 test flight the aircraft next flew on its fatal May 11th flight. On May 11th the plane began its take-off along the main runway at Falcon Field with a crew of three and three passengers. Thomas Moseley served as pilot, Charles Lynn served as flight engineer and Basil Baker, a mechanic, was a passenger on N45516. Moments after take-off, with the right main landing gear failing to retract, smoke began to stream from the rear of the number two engine nacelle.[2] The plane crashed shortly thereafter, killing all persons aboard. An examination of the wreckage revealed that the crew had feathered [3] engine number three sometime after takeoff. Also, all engines exhibited evidence of detonation.[4] Further facts will be set forth in the discussion of issues to which they relate.

## DEPOSITION OF CHARLES CAREL

At trial the appellees' accident reconstruction expert, Hubert Charles Carel, an aeronautical engineer, testified on direct examination that, in his opinion, crew mismanagement of the power caused the crash. On cross-examination the attorney for one of the appellants attempted to question Carel about Carel's August 29, 1979 deposition testimony in which he stated that one contributing factor to the crew mismanagement was a fire during takeoff in the number two engine nacelle. Appellees objected to this line of inquiry on the ground that the deposition testimony assumed facts not in evidence at the trial. Specifically, appellees claimed that Carel's opinion that a fire occurred was based on a hearsay statement of an eyewitness, Mr. Losey, contained in the National Transportation Safety Board (NTSB) report of the accident. Mr. Losey was not called as a witness by either party, nor was the NTSB report introduced into evidence.[5] The trial court sustained appellees' objection.

Carel's opinion of the cause of the crash never varied. He believed that the crash was caused by crew mismanagement of the power setting and so testified at trial. What did change was Carel's predicate to the crew mismanagement. In his deposition it was apparently Carel's opinion that

---

1. The aircraft involved was a four engined plane, with two engines on each wing. Starting with the outboard engine to the pilot's left and going to the right, the engines are numbered one through four. For example, the number three engine is the inboard engine to the pilot's right.

2. A "nacelle" is the enclosure surrounding the engines.

3. "Feathered" is a term which refers to an adjustment of the propellor pitch so as to create less air resistance usually when the engine is not functioning.

4. "Detonation" describes the condition when fuel combustion occurs at inappropriate times. Much like pre-ignition in an automobile, detonation may destroy the cylinders of the engine. Detonation can result from many causes.

5. In the trial court, appellants successfully objected to the introduction of the NTSB report into evidence.

there was a fire in the number two engine nacelle, that the flight engineer failed to put out the fire, that the fire then caused confusion of the crew, and *as a result* the crew mismanaged the power settings. At trial Carel simply testified that the crash was caused by crew mismanagement of the power without reference to the alleged fire in the number two engine nacelle. It was on this point that the appellants sought to impeach Carel with his prior allegedly inconsistent statement.

The record before us reveals the following in chambers arguments:

MR. COPPLE: ...

To clarify it, Judge, let me read the explanation that Mr. Carel gave in his deposition [apparently taken November 4, 1979].

THE COURT: All right.

MR. COPPLE: This is on Page 7, starting at Line 3:

"QUESTION: Has there been any change whatsoever in the opinions that you expressed in your deposition of August 29, 1979?

"ANSWER: Not in—I don't believe so."

[MR. COPPLE:]

Now, let me preface this by saying the question that was asked just previously was:

"What was the source of the smoke? And he said, "Hydraulic or oil."

Then he is asked whether he changed the opinions that he had in his deposition. He says, "Not in—I don't believe so. One area that perhaps changed some was I spoke of fire in the left engine nacelle. And during the trial there was no testimony indicating that there was a fire. At this time I would say—I had fire/smoke in my deposition. And I would lean towards smoke at this time, not fire. I did in my deposition indicate I didn't believe there was a fire in that engine. And I still do. That has not changed."

"QUESTION: Are you telling us that your opinion now is that there was no fire in the left engine nacelle?

"ANSWER: That is correct.

"QUESTION: And you are confining that opinion to be only smoke emitted from the left engine nacelle?

"ANSWER: Based on the testimony of the trial, that is correct.

"QUESTION: And what testimony have you referred to that would lead you to change that opinion?

"ANSWER: Well, it is my understanding the parties that indicated there was a fire in the left nacelle did not testify at trial.

"QUESTION: And do you know the name of that party?

"ANSWER: I believe so. It's—I believe his name was Losey, L-o-s-e-y. I am not positive about that. But I believe that was the witness.

"QUESTION: Have you changed your opinion as to the source of the smoke on the left nacelle area in this aircraft?

"ANSWER: No.

[MR. COPPLE]

And then he goes on to say: "There is no physical evidence of fire to the engine."

Rule 703, Arizona Rules of Evidence, provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The comment to rule 703 explains:

This rule, along with others in this article, is designed to expedite the reception of expert testimony. Caution is urged in its use. Particular attention is called to the Advisory Committee's note to the Federal Rules of Evidence which accompanies Federal Rule 703. In addition, it should be emphasized that the standard "if of a type reasonably relied upon by

experts in the particular field" is applicable to both sentences of the rule....

The Advisory Committee's Note to Federal rule 703 states:

If it be feared that enlargement of permissible data may tend to break down the rules of exclusion unduly, notice should be taken that the rule requires that the facts or data "be of a type reasonably relied upon by experts in the particular field." The language would not warrant admitting in evidence the opinion of an "accidentologist" as to the point of impact in an automobile collision based on statements of bystanders, since this requirement is not satisfied.

■ An expert's opinion may properly rely on facts and data from only three sources: (1) facts admitted into evidence at trial, (2) facts personally perceived by the expert, and (3) facts of a type reasonably relied upon by experts in the particular field. 11 Moore's Federal Practice ¶¶ 703.-02, 703.10 (2d ed. 1982). *See Baumholser v. Amax Coal Co.*, 630 F.2d 550 (7th Cir. 1980); Ariz.R.Evid. 703; Udall & Livermore, *Law of Evidence* § 23, p. 38–41 (2d ed. 1982). None of the evidence admitted at trial indicated a fire in the number two engine nacelle. Nor did Carel have any personal perceptions indicating a fire.

■ Appellants, however, assert that Carel relied on the NTSB report, which is a type of evidence reasonably relied upon by experts in this area. The NTSB report contained Losey's statement. The above excerpt reveals that Carel's opinion expressed in the August 29th deposition relied on the hearsay statement of Losey, an eyewitness, contained in the NTSB report. The appellees do not contest appellants' characterization of Carel's deposition testimony. The source at issue here is Losey's statement, not the NTSB report. The test for admissibility of an expert's opinion based on facts not in evidence is whether the source relied upon by the expert is reliable. *Baumholser v. Amax Coal Co.; State v. Rupp*, 120 Ariz. 490, 586 P.2d 1302 (App.1978). The trial court is accorded

wide discretion in such determinations. *State v. Rupp.*

■ Facts or data, not admitted or inadmissible, on which an expert may reasonably rely may be revealed to the trier of fact not as substantive evidence but to show the basis of the expert's opinion. Udall & Livermore, *Law of Evidence* § 23 (2d ed. 1984 Pocket Part). Rule 705, Arizona Rules of Evidence, provides that the expert may be required to disclose the underlying facts or data for his opinion on cross-examination.

■ We believe the Rules of Evidence contemplate just such a situation as is before us. However, this is the type of eyewitness statement warned against in the Advisory Committee note, *supra*, even though the eyewitness statement only described a physical occurrence (fire coming from the number two nacelle) not the causation therefor, which is the province of the expert. The test is whether the source of the expert's opinion meets the two critical factors of necessity and trustworthiness. *Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541 (5th Cir.1978). Trustworthiness comes from external indicia of reliability, such as a routine and customary business record or preparation of a report by a disinterested, expert third party. *Id.* Such external indicia is not present where a testifying expert's opinion is based on statements of an eyewitness concerning the event giving rise to the lawsuit, where such statements are not in evidence at trial. *See* Fed.R.Evid. 703, Advisory Comm. Note. Losey was not called as a witness at trial even though he had been deposed.

■ Additionally, Carel's deposition testimony was brought before the jury through appellants' counsel during his examination of Carel in another context at trial (counsel read the following from Carel's deposition):

"Well, in terms of causative factors, I believe, and I think I mentioned this, there was some failure in the aircraft was contributed to the distraction of the flight engineer. And I don't know what

that failure was at this time, but it appears to have been a fire in the number two nacelle. And he had the additional responsibility of extinguishing that fire."

We cannot say the trial court abused its discretion in precluding further cross-examination of Carel on this issue.

### CALVIN FRIESWYK

Appellants sought to impeach Richard Packard, the president of Helitec Corporation, a part-owner of AFG Corporation, and vice-president of all other appellee corporations, by the rebuttal testimony of Calvin Frieswyk, a State Compensation Fund investigator, who authored a report dated May 30, 1975. The trial court, however, refused to allow the admission of such evidence.

At trial, Packard testified as follows:

Q Now, Mr. Packard, as a result of the test flight of 45516 on May 6, 1975, was there any problems that came about as far as this aircraft was concerned on any aspect of that aircraft?

A I don't recall any problems.

Q If there had been any problems, you would have known it; is that correct?

A If there would have been a major problem, I would have known it.

Q What about a minor problem? Would you have known that, too, sir?

A Doubtful that I would know about a minor squawk on an airplane.

Q You would be concerned about whether or not there was any mechanical problems with an aircraft that your people are going to be flying in, would you not?

A I wouldn't be concerned with a minor problem, because flight engineers make sure discrepancies are taken care of before they fly.

Q You had an ADI system supposedly installed on these aircraft. You would be concerned about, number one, that there would be no problems with that system, because of the pressures that those engines were going to be sustaining with these power settings and with this fuel; wouldn't that be correct?

A I would be concerned if they had an engine problem. But I don't recall anybody notifying me that we did have a problem.

Q On 45516? .

A On 45516.

Q Now, and you have never had a conversation with any person concerning any alleged problems with 45516 that arose as a result of the test flight on 5–6–75?

A I don't recall anything on the ADI system.

Q What about anything about any of the engines?

A I don't recall anything on an engine of any major nature.

Q So do you recall anything of any minor nature concerning any of the engines on 45516 after the test flight on May 6, 1975?

A No, I don't.

Q And if there had been, you would have remembered today, I would presume?

A If it were an airworthiness item that was of a major nature, I am sure I would remember.

Frieswyk's report stated:

I next interviewed Richard E. Packard, Vice President, regarding the crash. He stated the engines on the aircraft had not been modified except for the number two engine, which had a small spray pump attached which would pull only approximately ten horsepower, but was inactive until the plane was in a spraying operation. The aircraft, however, had been modified. The plane had been test flown approximately two week [sic] prior to the 5–11–75 date and a fuel flow problem was found in engine number three and this had been corrected by the mechanics.... Witnesses stated there was a fire in the number two engine area and Mr. Packard ... thought [he] saw a flame from a wheel housing also.

The appellants had alleged in their complaint that the plane had been modified by appellees (defendants) in a negligent and careless manner creating an unsafe condition in the aircraft which ultimately caused it to crash. These modifications were followed by only one test flight. Thus the condition of the engines after the test flight was of critical importance to the appellants' case. The test pilot, Bobby Morren, one of the owners, Packard, and the principal power plant mechanic, Thompson, all testified that there were no engine problems on the May 6, 1975 test flight.

The trial court refused to allow the impeachment of Packard by calling Calvin Frieswyk as a rebuttal witness because the appellants had failed to ask Packard a "warning question":

[THE COURT]
I am asking about the warning question, because that's what we are talking about when we talk about impeachment.

Before you impeach somebody, you have got to give them the opportunity to 'fess up' to the inconsistency that you are planning to put in, and not to do it by laying in the weeds, putting on the inconsistent statement, and then having them come back on either redirect—I am sorry, on surrebuttal to explain it away. I think that is basic advocacy.

■ The trial court erred in its ruling. Arizona courts have held that warning questions—directing the witness' attention to the date, place, and circumstances when the witness made prior statements—are not required. *State v. Hines*, 130 Ariz. 68, 633 P.2d 1384 (1981); *State v. Acree*, 121 Ariz. 94, 588 P.2d 836 (1978); *State v. Navallez*, 131 Ariz. 172, 639 P.2d 362 (App. 1981).

■ Furthermore, Packard's statements constituted a party admission pursuant to Rule 801(d)(2), Arizona Rules of Evidence, and therefore, the witness need not be given an opportunity to explain or deny the prior statement. Rule 613(b), Arizona Rules of Evidence, provides:

Extrinsic evidence of a prior inconsistent statement by a witness is not admissible

unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).

■ Appellants alternatively sought to reopen their case-in-chief to recall Packard or call Frieswyk. The trial court denied the motion after appellees objected on grounds of materiality and surprise as to Frieswyk. A motion to reopen is directed to the court's discretion. *Melcher v. Melcher*, 137 Ariz. 210, 669 P.2d 987 (App. 1983); *Cf. Heeter v. Moore Drug Co.*, 104 Ariz. 41, 448 P.2d 391 (1968). *See generally DeElena v. Southern Pacific Co.*, 121 Ariz. 563, 592 P.2d 759 (1979) (order of proof lies within trial court's discretion).

Frieswyk's report was included in the Industrial Commission's file, which had been subpoenaed and produced in August, 1979 at a deposition. At trial, however, one of appellants' attorneys indicated that a copy of the Frieswyk report had not been included in copies of the Industrial Commission's file provided to appellants. The record does not indicate at which point in time or how appellant obtained a copy of Frieswyk's report. Nevertheless at least by October 22, 1979, while appellants were still presenting their case-in-chief, the appellants had in their possession a copy of the Frieswyk report. On or about October 22nd one of appellants' attorneys met and discussed with Mr. Frieswyk the contents of his report. A subpoena was issued for Frieswyk on October 23rd and served October 24th. It was filed with the court on October 29th.

On October 25th the appellants rested their case-in-chief. Thereafter, the trial resumed on October 29, 1979 with the appellees presenting their case. On November 1st, counsel elicited the testimony from Mr. Packard quoted earlier. Then, the record, which is admittedly unclear, shows that apparently on November 6th appellants

first disclosed any intent to call Mr. Frieswyk or use his report.

■ Rule XVI(c)(1)(vii) Uniform Rules of Practice of the Superior Court of Arizona at time of trial provided that the joint pre-trial statement shall contain:

The exhibits and names of witnesses to be used for impeachment have been sealed and filed with the clerk of the court.

No other exhibits or witnesses shall be used during the trial other than those listed and exchanged, except for good cause shown.

[Deleted July 6, 1983, effective September 7, 1983. *See* Rule VI(a)(6).] Evidence intended to be used solely for impeachment may be withheld from opposing counsel if filed with the clerk of the court. *Helena Chemical Co. v. Coury Bros. Ranches, Inc.,* 126 Ariz. 448, 616 P.2d 908 (App. 1980). Therefore appellees' claim of surprise should not have been considered by the trial court. Under certain circumstances the trial court may, in its discretion allow testimony by a witness not contained in the list of impeachment witnesses filed with the court. *Public Service Co. of Oklahoma v. Bleak,* 134 Ariz. 311, 656 P.2d 600 (1982). The trial court has broad discretion to permit or deny admission of evidence not listed in the pre-trial statement. As the supreme court stated in *Public Service Co. of Oklahoma v. Bleak:*

It is quite often difficult if not impossible for counsel to know precisely what type of impeachment will be necessary and available until the testimony of the witness is actually heard at trial. It is certainly well within the trial court's discretion to determine whether such a situation exists and to allow counsel to add to or vary from the impeachment list. It is seldom that any prejudice can result from this, since Rule VI(a)(7) does not provide for the parties to exchange impeachment lists, but rather, requires only that the impeachment list be sealed and filed with the clerk.

134 Ariz. at 325, 326, 656 P.2d 600. *See Plonkey v. Superior Court,* 106 Ariz. 310, 475 P.2d 492 (1970).

At trial appellants presented several theories of negligence relating to mechanical modification or maintenance of the airplane. Fuel flow problems in engine number three would have been material to several of appellants' theories of negligence.

■ The trial court erred in not allowing appellants to call Calvin Frieswyk as a witness. The trial court made an error of law regarding warning questions and materiality in reaching its discretionary conclusion. The error was prejudicial because it substantially affected the right of the appellant to put material evidence regarding the credibility of a material witness before the jury. *Petefish v. Dawe,* 137 Ariz. 570, 672 P.2d 914 (1983); *Reeves v. Markle,* 119 Ariz. 159, 579 P.2d 1382 (1978). Therefore we must reverse and remand for a new trial.

## CROSS–ISSUES ON APPEAL

The appellees have submitted two cross-issues on appeal which we must reach, having reversed the judgment for the appellees and remanded for new trial.

1. Were appellees statutory employers for purposes of workmen's compensation and therefore immune from the wrongful death actions by appellants?

2. Did appellants Baker fail to bring their action within one year and fail to obtain a valid reassignment of any claim from the compensatory fund so their action was a nullity?

## EMPLOYERS IMMUNITY

■ Long before the trial of this case began, Aviation Specialties Trade Corp., the admitted employer, sought summary judgment to dismiss the action as to it. It based its request on the following grounds: Aviation Specialty Trade Corp. was the decedents' employer, the decedents did not make an election of remedies at the time of their employment, and the decedents' plaintiffs had already accepted workmen's com-

pensation benefits as their exclusive remedy in accordance with A.R.S. § 23–1024. The trial judge granted summary judgment dismissing the action on the merits as to Aviation Specialties Trade Corp. and ordering that the plaintiffs recover nothing from Aviation Specialties Trade Corp. There was no appeal therefrom. The judgment determined that Aviation Specialties Trade Corp. was the decedents' employer. Therefore, only Aviation Specialties Trade Corp. is immune from suit. Appellees cite nothing in the record to support their theory of a "single statutory employer." There is no error in allowing suit against the appellee corporations other than Aviation Specialties Trade Corp. *Hecla Mining Co. v. Industrial Comm'n,* 119 Ariz. 313, 580 P.2d 774 (App.1978).

## BAKER ACTION

 Appellees claim that appellants Baker's action was a nullity because they failed to file their action within one year of the crash as required by A.R.S. § 23–1023 and because they failed to obtain a valid reassignment of any claim from the compensatory fund. However, under A.R.S. § 23–1023, if one entitled to compensation benefits does not file an action within one year after the claim accrues, the claim is deemed assigned to the insurance carrier or to the person liable for paying the compensation benefits. Thus in the instant case, one year after the crash Baker's claim was statutorily assigned to the insurance carrier pursuant to A.R.S. § 23–1023. The compensation fund then reassigned the claim to appellants Baker who filed the claim within the two year statute of limitations for personal injury actions. A.R.S. § 12–542(1), (2).

Subsequent to trial, the Arizona Supreme Court, in *Ross v. Superior Court,* 128 Ariz. 301, 625 P.2d 890 (1981) held that once a claim was assigned to an insurance carrier by operation of law pursuant to A.R.S. § 23–1023 it was neither assignable to a third person nor reassignable to the insurance claimant. The legislature following *Ross* amended A.R.S. § 23–1023 to allow

reassignment. The Arizona Supreme Court considered the constitutionality of the amendment in *Chevron Chemical Co. v. Superior Court,* 131 Ariz. 431, 641 P.2d 1275 (1982). The supreme court upheld the constitutionality of the amendment. In the case before us, the compensation fund's reassignment to appellants Baker was valid and Baker's claim was properly brought within the two year statute of limitations.

The judgment of the trial court is reversed and the case remanded for proceedings consistent with this opinion.

EUBANK and HAIRE, JJ., concur.