IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

―――――――――――――

THE STATE OF ARIZONA,
*Appellee*,

*v.*

MANUEL JESUS PESQUEIRA,
*Appellant*.

No. 2 CA-CR 2013-0134
Filed August 28, 2014

―――――――――――――

Appeal from the Superior Court in Pima County
No. CR20112669001
The Honorable Richard S. Fields, Judge

**AFFIRMED IN PART; VACATED IN PART**

―――――――――――――

COUNSEL

Thomas C. Horne, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Robert A. Walsh, Assistant Attorney General, Phoenix
*Counsel for Appellee*

DeConcini McDonald Yetwin & Lacy, P.C., Tucson
By Ronald Zack
*Counsel for Appellant*

**OPINION**

Judge Howard authored the opinion of the Court, in which Presiding Judge Kelly and Judge Vásquez concurred.

H O W A R D, Judge:

¶1        Following a jury trial, appellant Manuel Pesqueira was convicted of armed robbery, aggravated robbery, two counts of kidnapping, two counts of aggravated assault with a deadly weapon, and first-degree murder.  On appeal, he argues the trial court erred by allowing a medical expert witness to rely on an autopsy report created by a non-testifying expert, there was insufficient evidence to support the jury verdict for first-degree murder,  the court improperly enhanced some of his sentences, and the court erred in imposing a Criminal Restitution Order (CRO).  For the following reasons, we affirm the convictions and sentences, but vacate the CRO.

## Factual and Procedural Background

¶2        L.C. and his roommate, R.G., were asleep in a bedroom when they awoke to a "strange noise."  Shortly thereafter, Pesqueira entered the bedroom, pointed a gun at the men, and said he wanted their "money, belongings, [and] drugs."  Pesqueira took money from R.G.'s wallet and a jar of change before leaving the bedroom.  He then returned with a machete and again demanded money and drugs.  He took L.C.'s and R.G.'s cellular telephones and left the room.  Another man, Stephen Williams, then entered the bedroom with a gun, did not say anything, and shot L.C. in the head. Pesqueira and Williams then left the apartment.

¶3        L.C. was taken to the University Medical Center (UMC) where doctors performed surgery. But L.C. remained unconscious for the week he stayed at UMC and his estimated chances of recovery were "[v]ery slim," approximately eight percent.  L.C.'s family chose to move him to Mexico and, during the ambulance ride from UMC to Mexico, L.C. died.

**¶4**      Pesqueira was charged with and convicted of various offenses as described above. The trial court sentenced him to a combination of consecutive and concurrent prison terms on counts one through six, totaling thirty years. It also sentenced him to life in prison without the possibility of release for twenty-five years for the first-degree murder charge which was to run concurrently with the sentences for the other six charges. We have jurisdiction over his appeal pursuant to A.R.S. §§ 12-120.21(A)(1) and 13-4033(A)(1).

### Dr. Hess's Testimony

**¶5**      Pesqueira first argues the trial court erred in allowing the state's medical expert, Dr. Gregory Hess, to base his opinion as to the cause of L.C.'s death on the autopsy report generated in Mexico. He contends both that the testimony was inadmissible under Rule 703, Ariz. R. Evid., because the Mexican autopsy report was unreliable, and that it violated his Confrontation Clause rights.

**Rule 703**

**¶6**      Although Pesqueira objected below to the doctor's reliance on the autopsy report, he did not raise its noncompliance with Rule 703. He has therefore forfeited review for all but fundamental, prejudicial error. *See State v. Henderson*, 210 Ariz. 561, ¶¶ 19-20, 115 P.3d 601, 607 (2005); *State v. Lopez*, 217 Ariz. 433, ¶ 4, 175 P.3d 682, 683 (App. 2008) ("[A]n objection on one ground does not preserve the issue on another ground."). Fundamental error is "'error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial.'" *Henderson*, 210 Ariz. 561, ¶ 19, 115 P.3d at 607, *quoting State v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984). "To prevail on a claim of fundamental error, the [defendant] must first show error and then show that the error is fundamental and prejudicial." *State v. Edmisten*, 220 Ariz. 517, ¶ 11, 207 P.3d 770, 775 (App. 2009). Pesqueira has failed to argue the alleged error was fundamental, and therefore has waived review of this issue. *State v. Moreno-Medrano*, 218 Ariz. 349, ¶ 17, 185 P.3d 135, 140 (App. 2008).

**¶7**      Moreover, although we will not overlook fundamental error when we see it, *State v. Fernandez*, 216 Ariz. 545, ¶ 32, 169 P.3d

641, 650 (App. 2007), here we find no error, fundamental or otherwise. *Henderson*, 210 Ariz. 561, ¶ 20, 115 P.3d at 607 (to show fundamental error, defendant must first demonstrate error). Pesqueira contends the autopsy report was insufficiently reliable to provide a basis for Hess's testimony. Rule 703 provides that an expert may rely on facts or data that are otherwise inadmissible "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Pesqueira cites *Pipher v. Loo* for the proposition that "'[t]he test for admissibility of an expert's opinion based on facts not in evidence is whether the source relied upon by the expert is reliable.'" 221 Ariz. 399, ¶ 8, 212 P.3d 91, 94 (App. 2009), *quoting Lynn v. Helitec Corp.*, 144 Ariz. 564, 568, 698 P.2d 1283, 1287 (App. 1984) (alteration in *Pipher*). As the court in *Pipher* pointed out, Rule 703 is a "foundational hurdle" to ensure the "data, facts, or methods upon which the expert's opinion is based exhibit sufficient indicia of reliability." *Id.*

**¶8**          The expert in *Pipher* based his opinion on his own laboratory research, clinical experience, and interviews he conducted, all of which constituted the "legitimate branch of . . . epidemiological research." *Id.* ¶ 10. No evidence was presented that the sources were "unreliable or untrustworthy" and the court therefore did not err by admitting the testimony. *Id.*

**¶9**          Conversely, the accident reconstruction expert in *Lynn* based his opinion solely on the "statements of an eyewitness concerning the event giving rise to the lawsuit," which had no "external indicia of reliability, such as a routine and customary business record or preparation of a report by a disinterested, expert third party." 144 Ariz. at 566, 568, 698 P.2d at 1285, 1287. The testimony was therefore inadmissible under Rule 703. *Id.* at 567-69, 698 P.2d at 1286-88.

**¶10**          Pesqueira contends "there was no evidence presented whatsoever that the autopsy report was reliable," but similarly no evidence established that it was unreliable, or that Hess's reliance on it was unreasonable. Hess testified that the autopsy report was "incomplete" by Pima County standards because the examiner only fully examined L.C.'s head and chest. But Hess also stated that type of "limited" autopsy was similar to those done in other parts of the

United States and that those examinations were in no way "inaccurate." He additionally testified that the findings in the report were consistent with the UMC medical records, and it served its purpose of "determin[ing] the cause and manner of death." The autopsy report thus has "sufficient indicia of reliability" to have properly formed the basis for Hess's opinion under Rule 703. *See Pipher*, 221 Ariz. 399, ¶ 8, 212 P.3d at 94. Furthermore, by allowing Hess's testimony, the court implicitly found the autopsy report was reliable. *See id.* ¶ 10.

**¶11** Additionally, in considering a challenge to evidence under Rule 703, our supreme court reviews whether the expert's reliance on the inadmissible data was reasonable, not whether the data itself was reliable. *See State v. Rogovich*, 188 Ariz. 38, 41-42, 932 P.2d 794, 797-98 (1997). Thus, although the reliability of the data may be an underlying consideration, we question whether *Pipher* and *Lynn* set forth the proper test. The focus is more properly placed on the expert's reasonable reliance, which we analyze here. *See id*.

**¶12** Experts commonly rely on other expert's opinions. *See State v. Lundstrom*, 161 Ariz. 141, 146, 776 P.2d 1067, 1072 (1989) ("It is hard to say . . . that it is not reasonable [for experts] to rely on . . . shared opinions"), *quoting* Morris K. Udall & Joseph Livermore, *Arizona Practice: Law of Evidence* § 23, at 12 (2d ed. Supp. 1989) (alteration in *Lundstrom*). Rule 703 therefore "allows a testifying expert to reach and express an opinion in the courtroom in the same manner he or she would in the laboratory or other work place." *Rogovich*, 188 Ariz. at 42, 932 P.2d at 798. Nothing in the record before us suggests that Hess's reliance on the autopsy report was unreasonable. *See id.* at 41-42, 932 P.2d at 797-98. Accordingly, Pesqueira has failed to show that Hess's reliance on the autopsy report violated Rule 703. *See id.*

**¶13** Furthermore, although Pesqueira contends that the person who performed the autopsy may not have been qualified to do so under Arizona statutory requirements, Rule 703 "does not require that the facts or data used as a basis for an opinion be generated by a qualified, testifying expert." *Id.* at 41, 932 P.2d at 797. Pesqueira has not cited any legal authority for the proposition that

an expert may only base his opinion on documents entirely consistent with the laws and regulations of the jurisdiction in which the crime was committed. Under Rule 703, the primary issue is not the qualifications of the non-testifying expert, but whether the testifying expert reasonably relied on the report and opinions. *See id.* at 41-42, 932 P.2d at 797-98. Accordingly, whether the expert is qualified to conduct an autopsy in Arizona is irrelevant.

**¶14** Finally, "'[q]uestions about the accuracy and reliability of a witness' factual basis, data, and methods go to the weight and credibility of the witness' testimony and are questions of fact. . . . It is the jury's function to determine accuracy, weight, or credibility.'" *Pipher*, 221 Ariz. 399, ¶ 17, 212 P.3d at 96, *quoting Logerquist v. McVey*, 196 Ariz. 470, ¶ 52, 1 P.3d 113, 131 (2000). Nearly all of the issues Pesqueira now contends make the autopsy report unreliable were raised in his cross-examination of Hess and his direct examination of his own medical expert. The jury was free to weigh the credibility of Hess's opinion based on what it heard about the autopsy report. *Id.*; *see also* Ariz. R. Evid. 702(a). Because Pesqueira can show no error, fundamental or otherwise, we reject his argument. *Edmisten*, 220 Ariz. 517, ¶ 11, 207 P.3d at 775.

**Confrontation Clause**

**¶15** Pesqueira also contends that Hess's testimony regarding the autopsy report violated the Confrontation Clause. "We review de novo whether the admission of evidence violates the Confrontation Clause." *State v. Joseph*, 230 Ariz. 296, ¶ 7, 283 P.3d 27, 29 (2012), *cert. denied, ___ U.S. ___, 133 S. Ct. 936 (2013).*

**¶16** Our supreme court has "held that a testifying medical examiner may offer an opinion based on an autopsy performed by a non-testifying expert without violating the Confrontation Clause." *Id.* ¶ 8; *see also State v. Snelling*, 225 Ariz. 182, ¶¶ 19-20, 236 P.3d 409, 414 (2010); *State v. Tucker*, 215 Ariz. 298, ¶ 62, 160 P.3d 177, 194 (2007); *Rogovich*, 188 Ariz. at 42, 932 P.2d at 798. "Because the facts underlying an expert's opinion are admissible only to show the basis of that opinion and not to prove their truth, an expert does not admit hearsay or violate the Confrontation Clause by revealing the substance of a non-testifying expert's opinion." *Tucker*, 215 Ariz.

298, ¶ 62, 160 P.3d at 194. "Thus, the defendant's confrontation right extends to the testifying expert witness, not to those who do not testify but whose findings or research merely form the basis for the witness's testimony." *Rogovich*, 188 Ariz. at 42, 932 P.2d at 798.

**¶17** Here, Hess testified that he formed his own opinion after reviewing the autopsy report and photographs, UMC medical records, and the death certificate. Although he discussed the substance of the autopsy report, he explained that he had used that information, along with the other documents, to reach his own conclusions about the cause of L.C.'s death. Pesqueira also was able to confront and cross-examine Hess about his opinions. The autopsy report thus was not offered to prove the truth of its contents, but only to show the basis for Hess's opinion. Accordingly, the testimony did not violate Pesqueira's confrontation rights.[1] *See Tucker*, 215 Ariz. 298, ¶ 62, 160 P.3d at 194.

**¶18** Pesqueira argues, however, that the testimony was more akin to the affidavit of the non-testifying witness in *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009), because Hess ultimately

---

[1] Pesqueira points out that in Arizona autopsies must be performed by a forensic pathologist. A.R.S. § 11-592(B). He goes on to state that "in Arizona if a testifying medical examiner testifies to his opinion as to the cause of death based on an autopsy report prepared by a non-testifying expert, that non-testifying expert is a forensic pathologist." He appears to reason that fact makes this case distinguishable from the many cases finding this type of testimony permissible. *See, e.g.*, *Joseph*, 230 Ariz. 296, ¶ 8, 283 P.3d at 29; *Snelling*, 225 Ariz. 182, ¶¶ 19-20, 236 P.3d at 414. Pesqueira fails to explain or cite to any legal authority for his proposition that the court assumed that all cause-of-death experts base their opinions on autopsy reports generated under the statutory requirements of Arizona. He therefore has waived review of this argument. *See State v. Hardy*, 230 Ariz. 281, n.3, 283 P.3d 12, 16 n.3 (2012) (court limits review to arguments supported by authority); Ariz. R. Crim. P. 31.13(c)(1)(vi) (appellant's brief shall include argument stating party's contentions, "and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on").

agreed with the cause of death listed in the autopsy. In that case, the affidavits reporting forensic analysis—which showed the material seized by the police was cocaine—were admitted into evidence. *Id.* at 307. The court concluded the affidavits were "testimonial" because they were "a 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 310, *quoting Crawford v. Washington*, 541 U.S. 36, 51 (2004). Thus, "[t]he 'certificates' are functionally identical to live, in-court testimony." *Id.* at 310-11.

**¶19** Here, however, the autopsy report was not testimonial because it was not offered to establish or prove some fact. *See id.; see also State v. Medina*, 232 Ariz. 391, ¶¶ 62-63, 306 P.3d 48, 63-64 (2013) (autopsy report not testimonial). That Hess came to the same conclusion as the author of the autopsy report does not make the report testimonial. Rather, the report, which was not admitted into evidence, was one of three sources Hess relied upon in reaching that conclusion. Additionally, the testifying witness, Hess, was subject to cross-examination by Pesqueira. *See Melendez-Diaz, 557 U.S.* at 311. Consequently, Pesqueira's reliance on *Melendez-Diaz* fails.

## Sufficiency of the Evidence

**¶20** Pesqueira next argues that the trial court erred in denying his motion for a judgment of acquittal made pursuant to Rule 20, Ariz. R. Crim. P., because there was insufficient evidence to support the jury's verdict for first-degree murder. He thus claims the state did not prove that the gunshot wound to L.C.'s head was the cause of his death.

**¶21** We review de novo whether sufficient evidence supports a conviction. *State v. Mwandishi*, 229 Ariz. 570, ¶ 6, 278 P.3d 912, 913 (App. 2012). "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 66, 796 P.2d 866, 868 (1990), *quoting Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis omitted).

**¶22** As relevant here, a person commits first-degree murder when "[a]cting either alone or with one or more other persons the person commits or attempts to commit . . . kidnapping under § 13-1304, . . . robbery under § 13-1902, 13-1903 or 13-1904, . . . and, in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person." A.R.S. § 13-1105(A)(2). "Conduct is the cause of a result when . . . [b]ut for the conduct the result in question would not have occurred . . . [and t]he relationship between the conduct and result satisfies any additional causal requirements imposed by the statute defining the offense." A.R.S. § 13-203(A).

**¶23** A defendant's actions need not be the sole cause of the death for the defendant to be held criminally liable. *See State v. Slover*, 220 Ariz. 239, ¶ 11, 204 P.3d 1088, 1093 (App. 2009). Where an intervening cause results in the victim's death, the defendant is still responsible if his action "'creates the very risk of harm that causes the injury.'" *Id.*, quoting *Young v. Envtl. Air Prods., Inc.*, 136 Ariz. 206, 212, 665 P.2d 88, 94 (App. 1982). Likewise, an intervening cause will not relieve a defendant of responsibility "when the defendant's conduct 'increases the foreseeable risk of a particular harm occurring through . . . a second actor.'" *Id.*, quoting *Ontiveros v. Borak*, 136 Ariz. 500, 506, 667 P.2d 200, 206 (1983). But a defendant can be relieved from criminal liability if an intervening act is the superseding cause of the victim's death. *Id.* In criminal cases, "an event is superseding only if unforeseeable and, with benefit of hindsight, abnormal or extraordinary." *State v. Bass*, 198 Ariz. 571, ¶ 13, 12 P.3d 796, 801 (2000), *citing Petolicchio v. Santa Cruz Cnty. Fair and Rodeo Ass'n, Inc.*, 177 Ariz. 256, 263, 866 P.2d 1342, 1349 (1994).

**¶24** For example, in *State v. Fierro*, the victim was put on life support after being shot by the defendant several times in the chest and head. 124 Ariz. 182, 184, 603 P.2d 74, 76 (1979). Although doctors ultimately terminated life support, the court found the gunshot wounds were the proximate cause of the victim's death. *Id.* at 185, 603 P.2d at 77. The court pointed out "'[t]he fact that other causes contribute to the death does not relieve the actor of responsibility, provided such other causes are not the proximate cause of the death.'" *Id.*, quoting *State v. Cheatham*, 340 S.W.2d 16, 20 (Mo. 1960).

¶25        Pesqueira contends no evidence proved that the gunshot wound to the head caused L.C.'s death.  He speculates L.C. could have suffocated during his transport to Mexico.  He further contends L.C.'s family's decision to transport him from UMC to Mexico was a superseding cause that relieves him of criminal liability.

¶26        After Williams and Pesqueira left the apartment, police officers arrived and found L.C. motionless, unconscious and breathing laboriously.  At the hospital, doctors were unable to safely remove the bullet fragments from L.C.'s brain and estimated his chances of recovery at eight percent.  Pesqueira's own medical expert concluded that L.C.'s cause of death was "complications of a gunshot wound," and that it was unlikely something "unrelated" caused L.C.'s death.  That same expert also agreed that although any number of things could have caused L.C.'s death during the ambulance ride, such as a drug overdose or suffocation, "[i]t's the gunshot wound that put[] him in the condition where any of these things can happen to him."   The state's expert, Hess, similarly testified that L.C.'s cause of death was a "gunshot wound to the head," and that it was "a little unclear exactly what happened" between his release from UMC and his death, but "the injury to the brain is what set off the sequence of events."

¶27        Under these circumstances, a jury reasonably could conclude beyond a reasonable doubt that L.C.'s death was caused directly by being shot in the head by Williams.  Additionally, it could have concluded L.C.'s death, although not immediate, was a natural and foreseeable consequence of Williams's act.  But for that act, neither L.C. nor his family would have been in a position to risk the particular kinds of harm Pesqueira speculates could have caused his death.  *See* § 13-1105(A)(2); § 13-203(A); *see also Slover*, 220 Ariz. 239, ¶ 11, 204 P.3d at 1093; *Fierro*, 124 Ariz. at 185, 603 P.2d at 77.  And the jury could have found L.C.'s family's decision to move L.C. to Mexico, given the eight percent chance he would survive at the hospital, was not so abnormal or extraordinary as to constitute a supervening cause.  *See Fierro*, 124 Ariz. at 185, 603 P.2d at 77 ("The removal of the life support systems was not the proximate cause of death, the gunshot wounds were, and it was not error to find that the defendant was the cause of the victim's death.").

**¶28** Thus, viewing the evidence in the light most favorable to the prosecution, *Mathers*, 165 Ariz. at 66, 796 P.2d at 868, the jury reasonably could conclude that Williams's act of shooting L.C. had caused L.C.'s death. *See* A.R.S. § 13-1105(A)(2). Because sufficient evidence supported the jury's verdict, the trial court did not err in denying Pesqueira's Rule 20 motion. *See Mwandishi*, 229 Ariz. 570, ¶ 11, 278 P.3d at 914.

**Sentencing**

**¶29** Pesqueira next argues the trial court improperly enhanced his sentences based on the jury's dangerousness findings for the two kidnapping charges and the aggravated robbery charge because the state did not properly allege they were of a dangerous nature prior to trial. Because Pesqueira did not object below, he has forfeited review for all but fundamental, prejudicial error. *State v. Henderson*, 210 Ariz. 561, ¶ 19, 115 P.3d at 607. An illegal sentence, however, constitutes fundamental error. *State v. Thues*, 203 Ariz. 339, ¶ 4, 54 P.3d 368, 369 (App. 2002).

**¶30** "The charges in an indictment and the allegations of [dangerousness] are not procedural or substantive equivalents."[2] *State v. Cons*, 208 Ariz. 409, ¶ 4, 94 P.3d 609, 611 (App. 2004). The state may amend an indictment only to "correct mistakes of fact or remedy formal or technical defects." Ariz. R. Crim. P. 13.5(b). Within the time limits of Rule 16.1(b), Ariz. R. Crim. P., allegations of dangerousness may be filed at any time. Ariz. R. Crim. P. 13.5(a). The superior court also may allow the state to add an allegation of dangerousness at any time before trial as long as the defendant is not prejudiced by the untimely filing. § 13-704(L). Thus, allegations of dangerousness are not tied to the original indictment, and the

---

[2] In *Cons*, the court was analyzing allegations of prior convictions, not allegations of dangerousness. 208 Ariz. 409, ¶ 4, 94 P.3d 609, 611 (App. 2004). Prior convictions and dangerousness, however, are treated equally for the purposes of making such allegations under both the Rule 13.5(a), Ariz. R. Crim. P. and A.R.S. § 13-704(L). The court's analysis in *Cons* therefore applies equally to allegations of dangerousness.

state has great flexibility in making those allegations any time before trial. As this court has concluded, notice of allegations of dangerousness is sufficient when the defendant is not "'misled, surprised, or deceived in any way by the allegations.'" *State v. Benak*, 199 Ariz. 333, ¶ 16, 18 P.3d 127, 131 (App. 2001), *quoting State v. Bayliss*, 146 Ariz. 218, 219, 704 P.2d 1363, 1364 (App. 1985).

**¶31**       Pesqueira received sufficient notice that the state was seeking to enhance his sentences on these particular charges based on their dangerous nature. When the state filed its initial "Direct Indictment" against Pesqueira, it separately filed an allegation of dangerousness as to all counts. Shortly thereafter, the state voluntarily remanded Pesqueira's case to the grand jury for a new determination of probable cause. After doing so, it re-filed the indictment, titled "Direct Indictment (Remand)," but did not re-file the allegations of dangerousness. The second indictment did not alter any of the charges that were in the first indictment and retained the same case number. Additionally, at the hearing in which the prosecutor stated she was voluntarily remanding the indictment to the grand jury, the court informed the parties that if the grand jury re-indicted Pesqueira, the previously scheduled case management conference would still be in place and continue. [3] Pesqueira has not cited, nor could this court find, any authority that the state is required to re-file allegations of dangerousness when it re-files an identical indictment under the same cause number in a continuing criminal case. Accordingly, we reject Pesqueira's argument.

**¶32**       Moreover, it was clear to all the parties that the criminal case against Pesqueira would continue as it had up until that point if the grand jury re-indicted him. The only change in the second indictment was the addition of "(Remand)," none of the charges changed, the indictment retained the same case number, and the judge made clear that he would not regard the re-indictment as

---

[3]This hearing pertained to Pesqueira's co-defendant, and thus Pesqueira was not present when this exchange took place. The minute entry, however, states that a copy would be sent to Pesqueira's counsel. Pesqueira does not dispute that he received the minute entry.

commencing an entirely new criminal proceeding. Pesqueira therefore had notice that if the grand jury re-indicted him, the criminal case would continue uninterrupted. Pesqueira has not explained why, under these circumstances, he was in any way misled, surprised, or deceived by the court's enhancement of his sentence based on the jury's finding of dangerousness. *See Benak*, 199 Ariz. 333, ¶ 16, 18 P.3d at 131. Accordingly, the trial court did not err by enhancing Pesqueira's sentences for the two kidnapping charges and the aggravated robbery charge based on their dangerous nature.

## Criminal Restitution Order

**¶33** Pesqueira lastly contends that the trial court improperly imposed a CRO, which the state does not dispute. The court, in its sentencing minute entry, reduced the "fines, fees, assessments and/or restitution" it had imposed "to a [CRO]." But as this court has determined, based on A.R.S. § 13-805(C),[4] "the imposition of a CRO before the defendant's probation or sentence has expired 'constitutes an illegal sentence, which is necessarily fundamental, reversible error.'" *State v. Lopez*, 231 Ariz. 561, ¶ 2, 298 P.3d 909, 910 (App. 2013), *quoting State v. Lewandowski*, 220 Ariz. 531, ¶ 15, 207 P.3d 784, 789 (App. 2009).[5] Therefore, because this portion of the sentencing minute entry is not authorized by statute, the CRO must be vacated.

## Disposition

**¶34** Based on the foregoing, we affirm Pesqueira's convictions and sentences, but vacate the CRO.

---

[4]Section 13-805(C) has since been renumbered to § 13-805(E). *See* 2012 Ariz. Sess. Laws, ch. 269, § 1.

[5]Based on amendments to § 13-805, this court has determined that *Lopez* does not apply in cases where the defendant is ordered to pay restitution to a victim. *State v. Cota*, 234 Ariz. 180, ¶¶ 1, 16, 319 P.3d 242, 243, 247 (App. 2014). Those amendments went into effect on April 1, 2013, after Pesqueira was sentenced. 2012 Ariz. Sess. Laws, ch. 269, § 1. Accordingly, the amendment does not apply here and the CRO was illegal in its entirety.